# United States Court of Appeals
## For the First Circuit

No. 03-2439

IRAJ DANAIPOUR,
Petitioner, Appellant,

v.

KRISTINA MCLAREY,
Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Douglas P. Woodlock, U.S. District Judge]

Before
Boudin, Chief Judge,
Lynch, Circuit Judge,
Schwarzer[*], Senior District Judge.

Stephen J. Cullen, with whom Miles & Stockbridge P.C. and Mary
A. Azzarito were on brief, for petitioner-appellant.
Rheba Rutkowski, with whom Beth I.Z. Boland, Jenny K. Cooper,
Bingham McCutchen LLP, Elizabeth B. Burnett, Paul D. Abbott, and
Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. were on brief,
for respondent-appellee.
Pauline Quirion and Greater Boston Legal Services on brief for
Greater Boston Legal Services, Massachusetts Citizens for Children,
Community Legal Services and Counseling Center, Emerge, Inc., and
Gloucester Men Against Domestic Abuse, amici curiae.

October 12, 2004

---

[*]Of the Northern District of California, sitting by
designation.

**LYNCH**, <u>**Circuit Judge**</u>.  Kristina McLarey, estranged from her then-husband, Iraj Danaipour, in June 2001 removed her two young daughters, A.D. and C.D., from Sweden, the country of habitual residence, and brought them to the United States in violation of a Swedish Court order.  A.D. was then seven and C.D. was almost three years old.

Danaipour filed suit in the United States in state court; the case was removed to federal court, and he sought to have the children returned pursuant to the International Child Abduction Remedies Act, 42 U.S.C. § 11601, and the Hague Convention on the Civil Aspects of International Child Abduction, opened for signature Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. McLarey had filed her own Hague Convention action earlier to prevent return; she responded to Danaipour's action by claiming the extremely narrow protection available under Article 13(b) of the Convention.  Article 13(b) permits the court to decline to return children to the country of habitual residence where return would cause grave risk of physical or psychological harm to them or otherwise place them in an intolerable situation.  Specifically, the mother asserted that the father had sexually abused both children and returning the two children to Sweden would cause them grave risk of harm.

The federal district court declined to resolve the question of whether either of the girls had been sexually abused,

preferring that the children be returned so the courts of Sweden could resolve that issue. See Danaipour v. McLarey, 183 F. Supp. 2d 311, 314 (D. Mass. 2002). This court reversed. See Danaipour v. McLarey, 286 F.3d 1, 5 (1st Cir. 2002) ("Danaipour I"). We remanded the case with instructions that the sexual abuse question must be decided (as part of the court's obligation to consider the grave risk issue), and then that the question of grave risk be addressed in light of this finding.

On remand, the district court found, after trial, by clear and convincing evidence that the younger child, C.D., had been sexually abused by her father but that the older daughter, A.D., had not been. The court also found that there would be a grave risk of harm to and an intolerable situation for both children if the court ordered them returned to Sweden, where their father continues to live. The father now appeals from that decision.

The father's appeal argues that the judgment is based on the following errors. Danaipour first contends the sexual abuse determination falters for evidentiary insufficiency, based in part on inadmissibility of certain evidence. He argues that the finding of sexual abuse was clearly erroneous because the court-appointed expert, Dr. Pierre, made no such finding and the district court relied on the testimony of expert witnesses who had never met the child. This argument is supplemented by the argument that the

-3-

court abused its discretion in admitting multiple hearsay evidence under Rules 803(4) and 807. Recognizing the dangers inherent in partisan reports of a child's statements to an examining or consulting expert (for example, by a mother accusing a father of sexual abuse of a child), we hold there was no abuse of discretion in admission of such evidence here, which was, _inter_ _alia_, also introduced through direct testimony and corroborated by statements made directly to the doctors by the children.

As to the grave risk finding, Danaipour argues the court erred in considering one item about the father's behavior, and that it failed to comply with this court's mandate and committed reversible error, as a matter of law, in failing to determine whether the courts of Sweden could properly address any issue of grave risk. Danaipour mischaracterizes the district court's findings. The district court complied with this court's mandate and, having answered the question of whether sexual abuse occurred, separately addressed the issue of grave risk of harm to the physical or psychological health of the children. The court's findings that the _return_ of the children to Sweden would cause grave harm to the psychological health of the children was supported by the record. That finding renders immaterial Danaipour's arguments that the courts of Sweden could take ameliorative actions to prevent further harm once the children had been returned. In such circumstances, Article 13(b) does not

require separate consideration either of undertakings or of steps which might be taken by the courts of the country of habitual residence.

The district court handled this difficult matter on remand in an admirable and sensitive way. We affirm.

## I.

The facts of this case are set out both in the original district court's opinion, Danaipour v. McLarey, 183 F. Supp. 2d at 316-23, and in the original case before this court, Danaipour I, 286 F.3d at 5-13. We summarize those facts briefly here. Kristina McLarey, a dual citizen of the United States and Sweden, lived with Iraj Danaipour, a Swedish citizen and Iranian national, in Sweden. The two met in Sweden and had their first child, A.D., there in 1994, shortly after which they were married in Massachusetts. They returned to Sweden and had a second child, C.D., in 1998. The family lived in Sweden, with frequent visits to the United States, where Ms. McLarey's family resides.

The couple's marriage deteriorated, and they jointly filed for divorce in February of 2000. They were eventually awarded joint custody of the children, with McLarey residing at the couple's condominium and Danaipour at his girlfriend's apartment. The two girls alternated between them on a weekly basis. During this time, McLarey noticed vaginal redness and soreness by her younger daughter, C.D., as well as symptoms of anxiety by both

girls, such as nightmares, headaches, and stomachaches when they returned from being with their father. McLarey testified that she questioned C.D. about her vaginal soreness, and the child responded "Baba [the child's name for her father] do like this," after which C.D. made a masturbatory motion. McLarey reported this information to a child psychologist, who issued a report of suspected child abuse and referred the case to Swedish social services, who then contacted the police to investigate. In November 2000, the police briefly interviewed the girls (A.D. was questioned for less than an hour, and C.D. was questioned for five minutes), who were nonresponsive to their inquiries. The Swedish police terminated their investigation in January 2001.

In early 2001, McLarey requested a separate sexual abuse evaluation by the Swedish child and youth psychiatric unit. The unit would not conduct such an investigation absent Danaipour's consent, which he refused to give. During this time, C.D. made additional disclosures to Ms. McLarey, her grandmother, and to Ms. McLarey's boyfriend that raised further concerns that the child had been sexually abused by her father. After videotaping one such disclosure by C.D., in March 2001 McLarey sought a Swedish court order for a full sexual abuse investigation. The court denied the order because Danaipour opposed it.

McLarey left Sweden with her children and came to Massachusetts. She did so without Danaipour's knowledge or consent and in violation of a Swedish court custody order.

Shortly after arriving in Massachusetts, McLarey brought both her children to a child psychologist, Dr. Toni Luxenberg, for treatment for symptoms which McLarey thought resulted from sexual abuse. Dr. Luxenberg's role was not to make an evaluation of whether sexual abuse had taken place, but to treat the children. McLarey informed Dr. Luxenberg of the disclosures C.D. had made to her and other family members, and Dr. Luxenberg in addition spoke to the children's grandmother. Thereupon, Dr. Luxenberg began treating the girls, meeting them once a week together or separately for approximately one hour. After C.D. developed a comfort level with Dr. Luxenberg, the child began to make significant disclosures to Dr. Luxenberg, above and beyond any she had made to her family members. Such disclosures led Dr. Luxenberg to conclude that C.D. had in fact been sexually abused by Danaipour. Dr. Luxenberg has continued to treat C.D. and A.D. throughout this litigation.

**II.**

A. Sexual Abuse Finding

The original district court found that a forensic examination would be needed to determine the sexual abuse question and that the Swedish courts, acting under conditions set for return of the children, could determine what to do after a forensic

-7-

examination was done in Sweden. We disagreed. In Danaipour I, 286 F.3d at 26, we noted that on remand, if necessary, the district court should order further evaluations, but we did not mandate any particular method by which the district court should address the two questions of whether there had been sexual abuse and whether there was grave risk.

On remand, the district court decided that a new trial should be held to determine whether sexual abuse occurred. The court also decided that an independent expert evaluation should be attempted as to whether either girl had been sexually abused, mindful that this belated evaluation might prove to be inconclusive and of the potential trauma to the children. The court appointed an independent child psychologist, Dr. Claudette Pierre, to perform a sexual abuse evaluation of the girls. Dr. Pierre spoke with both girls, the parents, reviewed the file, and filed a report. Dr. Pierre concluded that A.D. had not been abused. Dr. Pierre also found that C.D. had in fact been traumatized by some events, most likely sexual in nature, but that Dr. Pierre could not conclusively determine whether C.D.'s father had in fact sexually abused her.

The parties agreed that the children should not testify. In conducting the trial, the court elected to have the parties submit affidavits for each of their witnesses as direct testimony, and cross examination was done of these witnesses on the stand.

The parties had the opportunity to object to evidence in the affidavits.

Danaipour made a general unspecified objection to hearsay evidence in the affidavits of McLarey's witnesses. The court then asked for the objection to be stated more specifically in writing. The court said it would allow the testimony and cross examination, but would consider the written objection and whether to credit the evidence when deciding the merits of the case.

Danaipour then filed a motion objecting only to any "double hearsay," specifically referring to statements in the psychologists' reports by family members recounting to the doctors what the children had said to them. Petitioner conceded that statements made by the children to the psychologists were admissible under Fed. R. Evid. § 803(4), and conceded that statements made by the children to family members were "arguably" admissible under Fed. R. Evid. § 807 (and in any event did not challenge these statements, and does not do so here).

After the trial, the district court found:

> by clear and convincing evidence that sexual abuse of C.D., who was slightly younger than two and one-half years old at the time, involving more than one occasion of masturbation by and of Danaipour in the presence of and involving C.D. took place during this period of alternating supervision in the fall of 2000. I find further that this abuse stopped once a police investigation began at the end of November 2000. At least one act of abuse involved C.D. touching her father's erect penis and led to her touching

his ejaculant. At least one other such act involved digital masturbation of C.D. by Danaipour.

The judge found the disclosures of the children to McLarey, her then-boyfriend Morin, and the children's grandmother to be credible. In doing so, however, the court noted that it found pertinent Danaipour's expert's cautionary observations that a custodial parent in the context of a divorce may misinterpret behavior and symptoms of the child upon returning from a visit with the non-custodial parent. The court noted that it was "especially concerned that the reports of commentary by the children may have been overstated or manipulated." With this concern in mind, the court found these statements, given by the witnesses through their affidavits and subject to cross examination, to be credible. The court also used the indicia of credibility for statements by sexually abused children submitted to the court by McLarey's expert, Dr. Carole Jenny.

The court also found "highly persuasive" the disclosures made by C.D. to Dr. Luxenberg and Dr. Pierre. The court found that C.D.'s multiple disclosures to Dr. Luxenberg unambiguously demonstrated that C.D. associated the word "hammer" with masturbation, and that these references demonstrate that there were multiple occasions of her participating in masturbation of Danaipour and his masturbation of her. The court expressly considered the concern of Danaipour's expert that these disclosures

-10-

were tainted by inquiries by McLarey or Dr. Luxenberg, and found that C.D.'s recollection was not "materially tainted or otherwise the product of suggestion." The district court found that the characters and themes developed by C.D. through her play therapy with Dr. Luxenberg were used by her "as a means to express and disclose the abusive circumstances to which she has been exposed, and her reaction to those circumstances." We note only that our discussion does not repeat all the evidence on which the conclusion was based. Further, despite the fact that Dr. Pierre's ultimate conclusion was inconclusive as to whether C.D. had been sexually abused by her father, the court found that the corroborative disclosure from C.D. obtained by Dr. Pierre supported its finding, based on all the evidence, that C.D. had been abused by her father.

B. Grave Risk Finding

Having found by clear and convincing evidence that C.D. was sexually abused by her father, the court then went on to conclude, also by clear and convincing evidence, that returning the children to Sweden would create a grave risk of psychological harm and an intolerable situation for them. The court credited the observations of both Dr. van der Kolk and Dr. Luxenberg that returning C.D., who has been sexually abused, to the place of trauma and location of her victimization can have profoundly disturbing effects on the child. The court also credited the conclusions of Dr. van der Kolk, one of McLarey's expert witnesses,

-11-

that "it is important to the psychological well being of C.D. that what she has disclosed be believed and not appear to lead as a consequence to her return to the place of trauma." Thus, the court found that her return would create a grave risk of "fractur[ing] irremediably her sense of safety, justice and the value of truth telling," a situation the court found would be intolerable for her. The court found a similar, though derivative, effect would occur to A.D. This, coupled with the fact that "[t]he parties have proceeded on the assumption that the children should not be separated and that any order under the Hague Convention would apply to both," led the court to deny Danaipour's request to have the children sent back to Sweden.

**III.**

A. Challenge to the Finding of Sexual Abuse of C.D.

The party opposing return of the children, here, the mother, has the burden of proving the ultimate Article 13(b) exception issue by clear and convincing evidence. Danaipour I, 286 F.3d at 13. Subsidiary facts need be proven only by a preponderance of the evidence. We review factual determination under the Hague Convention for clear error. Whallon v. Lynn, 230 F.3d 450, 454 (1st Cir. 2000). We review questions of admissibility of evidence under an abuse of discretion standard. See Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212-13 (1st Cir. 1996).

The district court concluded that under Fed. R. Evid. 1101(b) "the summary character of Hague Convention proceedings does not require application of the Federal Rules of Evidence regarding hearsay. . . ." It nonetheless attempted "to parallel the procedures for notice and the concern for guarantees of trustworthiness which are found in Fed. R. Evid. 807, the residual hearsay exception frequently used when courts receive out of court statements by children in [a] child abuse case outside the Hague Convention context." While summary proceedings certainly may occur in cases under the Convention, this was not one. Indeed, this was a full trial. Whatever our doubts, nonetheless, Danaipour has not directly raised on appeal the point of the applicability of the Federal Rules of Evidence; at most he argues that the mother's family's recounting of the children's statements to physicians constituted inadmissible double hearsay and was inherently unreliable.

1. Objections to Portions of Doctor's Reports Admitted Under Fed. R. Evid. 803(4).

Danaipour objects to the admission of those portions of Dr. Luxenberg's reports containing statements by McLarey and her family about what the two children said.

Fed. R. Evid. 803(4) provides an exception to the hearsay rule for:

> (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and

describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Under the rule, there are three preconditions for admission of such statements: (1) the statements must be made for purposes of diagnosis or treatment[1] (2) about (i) medical history (ii) or past or present symptoms, pain, or sensations or (iii) about the inception or general character of the cause or external source thereof (3) insofar as they are reasonably pertinent to diagnosis or treatment. Child therapists routinely, as part of their diagnosis or treatment, obtain the type of statements made by the patients here, A.D. and C.D., about the identity of the perpetrator of the abuse. Morgan v. Foretich, 846 F.2d 941, 948-50 (4th Cir. 1988). Statements by young children amounting to disclosure to treating therapists that they have been abused by a

---

[1] We reject the notion, adopted by at least one circuit, that identifications by children who are abuse victims to doctors are only admissible "where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding." See Olesen v. Class, 164 F.3d 1096, 1098 (8th Cir. 1999) (quoting United States v. Renville, 779 F.2d 430, 438 (8th Cir. 1985)). There are many ways in which a party wishing to enter into evidence a statement under Rule 803(4) can demonstrate that the statement was made for the purpose of diagnosis or treatment; a per se rule requiring a doctor to explain to the victim why a statement naming an abuser is important to diagnosis and treatment is unnecessarily inflexible. See also United States v. Edward J., 224 F.3d 1216, 1219-20 (10th Cir. 2000) (rejecting 8th Circuit's approach and admitting victim's statements to doctor despite the fact that physician did not explain that information was important for treatment).

member of their family are usually reasonably pertinent to treatment of the child. United States v. Yazzie, 59 F.3d 807, 812-13 (9th Cir. 1995)("[S]exual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and identity of which depend upon the identity of the abuser.") (quoting United States v. George, 960 F.2d 97, 99 (9th Cir. 1992)); Morgan, 846 F.2d at 949; United States v. Renville, 779 F.2d 430, 436 (8th Cir. 1985). Danaipour agrees that statements made directly by A.D. and C.D. to Dr. Pierre and Dr. Luxenberg are admissible under Rule 803(4).

The problem presented here concerns statements by a parent or family member, not the child, to a doctor of what C.D. and A.D. said. The plain language of the rule does not require the statements to be made by the patients, or even to a physician. Yazzie, 59 F.3d at 813; Davignon v. Clemmey, 322 F.3d 1, 8 & n.3 (1st Cir. 2003) (permitting, under 803(4), testimony about statements by parents to a social worker concerning emotional distress of children). In situations in which there are no incentives for parental bias, parental reports to doctors of statements by their children are routinely admitted under Rule 803(4). See 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence 465 (2d ed. 1994) ("[The 803(4)] exception does not require that the speaker be the patient or that the listener be

the doctor. Clearly it reaches statements by family members (parent, sibling, or spouse) who bring a patient to a hospital or doctor's office."); 4 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 803.02[5][d] (8th ed. 2002) ("[S]tatements by bystanders, family members, and others, made for the purposes of treating an injured person and pertinent to that treatment, have often been admitted under Rule 803(4)."). One example would be a parental report of a five year old's statement explaining where and how she scraped her knee badly. In such situations, the incentives are strong for the parent to recount the child's statement accurately and honestly. The Rule recognizes the reality of the situation. The Advisory Committee's Notes contemplate that statements made to members of the family may be within the exception. Fed. R. Evid. 803(4) advisory committee's notes.

Under Rule 803(4), the declarant's motive to promote treatment or diagnosis is the factor crucial to reliability. Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.06[01] (Joseph M. McLaughlin ed., 4th ed. 2004). In sexual abuse cases, especially where one parent accuses the other of abuse, the motives and incentives of the reporting parent may be mixed or, indeed, may not be to tell the truth. Yazzie, 59 F.3d at 813. It may be clear from the circumstance or context that the parental report of a child's statement of abuse to a doctor is made for purposes other than for diagnosis or treatment. See United

<u>States</u> v. <u>Balfany</u>, 965 F.2d 575 (8th Cir. 1992) (considering that theory).

In a situation such as this where there are reasons to look skeptically on the motives of the declarant, the context in which the statements are made is relevant to whether they bear adequate indicia of trustworthiness. <u>Yazzie</u>, 59 F.3d at 813. McLarey brought her children to Dr. Luxenberg, not for the purposes of determining whether the children had been sexually abused, but for treating their symptoms as manifested by their disturbed behavior. Thus, the statements made by McLarey to Dr. Luxenberg were for the purposes of treatment.

Most of the cases cited by Danaipour in attempting to challenge the district court's admission of the objected-to statements are criminal cases, in which the evidence was subjected to Confrontation Clause analysis. The Supreme Court has stated that the Confrontation Clause creates a higher bar for the admission of hearsay evidence than do the Federal Rules alone. <u>Idaho</u> v. <u>Wright</u> 497 U.S. 804, 814 (1990) ("The Confrontation Clause . . . bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule."). This is a civil case.

In the end Danaipour's claim that the district court committed error by admitting and considering for the truth of the matter asserted the parental and family statements concerning C.D.

and A.D.'s statements in the reports of Dr. Luxenberg fails, for several reasons. First, the statements made by McLarey, her mother, and Morin in the doctor's reports were tested when each person took the witness stand, testified directly to the same statements by A.D. and C.D., and was subjected to cross examination about the hearsay to the doctors. There were no discrepancies.

Second, Dr. Luxenberg testified that the children made the same statements (as reported by McLarey, her mother, and Morin) directly to her during their therapy, corroborating the statements reported to her by the mother and her family. This is true for each of the statements to which objection was made. Indeed, C.D. made statements to Dr. Luxenberg about her father's actions which went beyond what she told her mother.

Danaipour's real objection is not that reports containing McLarey's and others' recounting of the children's statements were inadmissible double hearsay but rather that the children's statements were inherently unreliable, being a product of the mother's coaching of the children. The district court carefully considered the fact that statements by a young child, even if accurately recounted by an adult, may not reflect the truth. A child may say something in order to get attention. Further, a story once told may, for several reasons, be subject to repetition and elaboration. The court also carefully considered the concern expressed by the husband's expert that repeated inquiry on the

-18-

topic would taint C.D.'s recollections; the court found this had not happened.  The court was very attentive to the possibility of coaching and found that improbable, and that the statements did not bear the indicia of a suggested script.  In evaluating the reliability of the reported statements by the two children, the court utilized the indicia of credibility in sexual abuse cases referenced both in the literature and by Dr. Carole Jenny, a recognized expert.[2]  The court was well within its discretion in considering the truth of the statements by C.D. and A.D. as reported by McLarey and the others to Dr. Luxenberg.

    2.  <u>Consistency with Dr. Pierre's findings</u>.

Danaipour attacks the merits of the sexual abuse finding. He argues that the finding was impermissibly contrary to the conclusion of the one independent expert, Dr. Pierre, who concluded: "[i]t is very possible that something has happened, however, based on the contents of this disclosure evaluation it is difficult to determine the exact nature of what that is.  Therefore the results of this evaluation [as to C.D.] would have to be

---

[2]    The indicia of credibility recounted by Dr. Jenny with respect to children's disclosures of sexual abuse include, among other things: "(1) free recall, without specific prompting or questioning; (2) spontaneity; (3) agitation and distress upon making disclosures; (4) age-inappropriate sexual knowledge; and (5) use of developmentally appropriate words and sentence structure, as well as drawings containing sexualized themes."  This was supported by a literary review by Kathleen Coulborn-Faller and David L. Corwin, widely accepted in the field and published in the highly regarded <u>International Journal of Child Abuse and Neglect</u>.

considered inconclusive." Expanding on this, at trial, Dr. Pierre testified she was certain something happened to C.D. that was "traumatic" and "sexual" but said she "did not know specifically what that [was]."

Danaipour argues that it would require a very good reason for the district court, nonetheless, to conclude there was sexual abuse and that no such reason exists here. Danaipour argues that of the five experts who testified, only one, Dr. Pierre, was truly independent, and only two, Dr. Pierre and Dr. Luxenberg, actually met with and interviewed the children.[3]

We reject Danaipour's first argument that once the court-appointed expert said "the results of the evaluation as to C.D. would have to be considered inconclusive" the court could not plausibly conclude that C.D. had been sexually abused. First, there was no inconsistency between Dr. Pierre's report and the court's conclusions. We quote at greater length from Dr. Pierre's report:

---

[3]    Danaipour argues that the district court "inexplicably" gave great weight to the testimony of Dr. Carole Jenny, who never saw the children and who, contrary to the district court finding, concluded that the older child may have been abused as well as the younger one. Contrary to Danaipour's argument on appeal, the court did not rely for its sexual abuse findings on Dr. Jenny's conclusions that C.D. had been sexually abused. This assertion is flatly contradicted by the district court's opinion. While the district court agreed with Dr. Jenny's ultimate conclusion that C.D. had been sexually abused, it clearly stated that it only relied on her testimony concerning the indicia of credibility with respect to sexual abuse by children.

-20-

With regard to C.D. the case is less clear. The trail is cold for her collateral contacts which are vital in making determinations in cases with very young children. . . .

During this evaluation C. did speak. She initially denied everything. Upon further questioning she stated that maybe something happened once but never again. She then became very distressed stating that she was worried that she would get her Baba into trouble, her Momma into trouble and herself into trouble. It is common for children to fear hurting a parent with a disclosure. It is also common for a child to state abuse and then recant. This cannot be taken as a nondisclosure, but one is careful to not to consider it a full disclosure. C. was not clear enough during this evaluation for this examiner to feel completely comfortable that the information given in this disclosure interview was complete and solid enough to constitute a full disclosure. It is very possible that something has happened, however, based on the contents of this disclosure evaluation it is difficult to determine the exact nature of what that is. Therefore the results of this disclosure evaluation would have to be considered inconclusive.

However, it is clear to this examiner that something has happened to C. She stated that her Baba had done bad things to her and she wasn't going to tell me what they were. Based on what C. has said to her therapist she has had experiences with the father that the therapist considers abusive. Dr. Luxenberg's notes are compelling. C's memory of events is clearly hampered by the fact that the occurrences would have happened approximately 1 l/2 years ago which is almost half of her life ago. Not to mention that she has been in a therapeutic relationship focused on helping her heal. Old memories naturally become integrated into new ones. In addition, C's memories are most assuredly state dependent at such an early age and would naturally be more likely accessed through a therapeutic

-21-

> relationship than by direct questioning such as was done in the disclosure evaluation.
>
> My recommendation is that the evaluation end of this be terminated at this time. I do not believe another sexual abuse evaluation will come any closer to the truth than this one did. I would recommend that the therapeutic relationship continue and that information from that source continue to be given credibility.

Dr. Pierre also testified that from her own observations of C.D. it was clear something had happened to C.D. but she could not say with any degree of certainty what happened. She thought it not useful to do a further disclosure evaluation because the data was old and that Dr. Luxenberg had better data. And when Dr. Pierre considered Dr. Luxenberg's notes, she found the notes suggest that "something more compelling has happened and more worrisome," and that Dr. Luxenberg's data should be treated credibly. Dr. Pierre's opinion to a reasonable degree of medical certainty was that something had happened between C.D. and her father, and that something bad and something sexual had happened.

The court relied on the disclosures made by C.D. to both Dr. Luxenberg and Dr. Pierre, as well as the corroborative disclosures made by C.D. to her family members and the play activity of the child. The court stated: "The disclosures to Dr. Luxenberg are relatively unambiguous in demonstrating that C.D. associated the word 'hammer' with the arm movements involved in masturbation. Her alternate references to 'hammering' and being

-22-

herself 'hammered' satisfy me that there were multiple occasions involving her participation in masturbation of Danaipour and his masturbation of her." Further, the court found that the disclosure made by C.D. to Dr. Pierre was corroborative of those made to Dr. Luxenberg, and supported the finding of sexual abuse. Moreover, these statements were consistent with those testified to by McLarey, Morin, and the children's grandmother.

In interpreting the play activity of C.D. the district court also considered the interpretation of Dr. Munson, Danaipour's expert, that the play be interpreted as only expressing themes from an animation series. The court held that the play was more than a simple re-enactment of the series. Rather, C.D. used the characters and themes of the series to express and disclose the abuse and her reactions to it. The court considered and rejected the possibility of cultural distortion. The court found that while C.D.'s statements and activities were arguably ambiguous, the most logical interpretation was that C.D. had been sexually abused. In fact, the court accepted Dr. Munson's methodology of testing of contrary hypotheses and found "no other hypothesis as compelling as that C.D. was sexually abused by her father." The finding that C.D. was sexually abused by her father was supported by the evidence.

B. Challenge to the Finding that Return of C.D. and A.D. to Sweden Posed A Grave Risk of Psychological Harm

1. <u>Role of Danaipour's Acknowledgment of Responsibility</u>.

As a subsidiary finding in support of its grave risk conclusion, the district court commented that an "additional impediment to return" was the father's refusal to acknowledge that C.D. had any difficulties.

The court's comment was itself based on Dr. Pierre's report, which said that a first step in reducing harm would be "[Danaipour] offering [C.D.] an apology during his first contact with her. This apology does not have be one admitting guilt but rather one that acknowledges there have been some things that have happened that have caused her great worry and for that he is sorry." The report was issued on July 31, 2002 to the court and counsel. Danaipour testified on August 2, 2002. We have carefully read his testimony and it contains no indication of any willingness on his part to make the acknowledgment Dr. Pierre recommended. Rather, Danaipour testified that he had not looked at the report. He continued to insist, in the face of Dr. Pierre's report, that C.D.'s statements were the result of C.D. being coached and prompted by her mother. The district court also invited commentary from the parties on Dr. Pierre's report and received none.

Danaipour's argument is that he was precluded by a visitation order from speaking to C.D. and his motion for visitation rights had not been resolved, so the court's criticism is unfair. The argument mixes tenses. Dr. Pierre's report refers

-24-

to what Danaipour should do at any future point of first contact with C.D. On the witness stand he had the opportunity to express a willingness to take that step, a step which the independent expert characterized as a first step toward healing for his daughter. He chose instead to insist his daughter's statements were the result of programming by their mother. The court properly considered this in its evaluation.

2.  Article 13(b) Requirements.

The district court, consistent with the second aspect of the mandate, made explicit findings that the return of C.D. and A.D. to Sweden would cause each child a grave risk of psychological harm and create an intolerable situation. Danaipour's argument that the court did not make such findings is simply not supported by the record.

Danaipour makes another argument that the evidence did not support any finding of grave risk, particularly in light of the ability of the Swedish courts to rule on custody and visitation rights of children and Sweden's mechanisms to evaluate whether sexual abuse has occurred. Danaipour criticizes the district court for not directly addressing the issue of protections available in Sweden.

The court credited and primarily relied on the testimony of two experts, Dr. van der Kolk and Dr. Luxenberg, on the effects of a return on the two children. The evidence from Dr. Luxenberg

was particularly compelling; Dr. van der Kolk's conclusions were consistent.

Two days after the initial district judge ordered the return of the children to Sweden, Dr. Luxenberg met with C.D. At that session, C.D. spontaneously raised the topic of return, saying her mother had told them they had to go to Sweden. C.D. said she did not want to go to Sweden and did not want to see her father. Through her play she raised the issue that she had told the truth and that her father had not told the truth and had done bad things to her. C.D. became extremely anxious, screaming and shaking and repeating, "No, no, no, no!" She later expressed fear that if she saw her father again, "he'll just keep doing it, and I don't want him to." She equated a return to Sweden with seeing her father. In contrast to the ambivalent feelings C.D. expressed about her father, C.D. expressed no ambivalence about her desire not to return to him or to Sweden. C.D. made the point repeatedly.

Dr. Luxenberg also had therapeutic sessions with A.D. It was striking to her that A.D. never expressed any desire to return to Sweden or to see her father. A.D. told Dr. Luxenberg that she thought her father really did "do it" [to C.D.] and she hoped he would not do it again. She equated going back to Sweden with something bad happening to her, and expressed anxiety that if she were returned to Sweden she would be separated from her mother (as had happened during their last return to Sweden) and that her

father would "do those things that C.D. said that he did" again.

Dr. Luxenberg concluded:

It is imperative that C.D. and A.D. continue in therapy at this time. Both have been able to develop a very strong and trusting therapeutic relationship, and are able to talk about difficult issues in a way they were unable to do at the beginning of therapy. Without suggesting that the girls would be unable to re-form a similar therapeutic relationship elsewhere, disrupting their therapy at this critical time in their development may cause the girls to become reluctant to discuss their experiences and their emotional responses to them, which is vital to their psychological recovery. Both are still clearly worried about the potential consequences of being honest and open about their feelings and experiences, and to have therapy prematurely terminated would reinforce the sense that talking is, indeed, dangerous.

Dr. van der Kolk did not meet C.D. but did review the record and observed some testimony at trial. Dr. van der Kolk drew conclusions which were entirely consistent.[4]

---

[4] We summarize the conclusions in his testimony:
1. For A.D. and C.D., being sent back to Sweden will mean that they are not believed and that telling the truth as they see it will have dire consequences. They will believe they are being punished for their disclosures.
2. C.D.'s psychological health is at a critical juncture at this particular point in time, and returning her to Sweden now will likely have devastating and irreversible consequences. She needs to feel safe.
3. If the girls perceive that they are not believed, or if actions are taken that indicate that disclosing the truth of their experiences will lead to retaliation or separation from the people they feel safe with, the natural consequence would be that these girls will grow up believing that telling people the truth has dire ramifications, and that the rules that are applied to them do not apply to others.
4. If returned, C.D. and A.D. were likely to have similar

The district court concluded that psychological harm to C.D. and A.D. would be a necessary consequence of a return to Sweden, regardless of any possible conditions or undertakings imposed. These harms were beyond the power of any court to prevent or remedy if the children were returned. Danaipour's arguments about the authority of the Swedish courts are, as a result, beside the point. Nothing in Article 13(b) required further inquiry in these circumstances, as this case involves "a situation in which the [Swedish] authorities, through no fault of their own, may not be able to give the children adequate protection." Blondin v. Dubois, 238 F.3d 153, 163 n.11 (2d Cir. 2001).

Danaipour cites to our holding in Danaipour I stating the standard for qualifying for the Article 13(b) exception, for the proposition that a district court cannot properly find that an Article 13(b) exception exists unless it examines the remedies

responses in Sweden and react with "fright or freeze" reactions to the sound of the Swedish language, to familiar sights, sounds, smells and temperatures.
5. Return would disrupt the relationship with Dr. Luxenberg. The relationship A.D. and C.D. have developed with Dr. Luxenberg will ultimately serve as a very significant stepping stone in the children's healing process and likely impact each child's individual ability to reestablish her personal integrity and self-confidence.
6. Both C.D. and A.D. have expressed their opposition to returning to Sweden and their anxiety regarding such a move. The girls' experience in Sweden has taught them that if they are sent back they will be reunited with their father - - in spite of their memories of his abuse, their disclosures about the abuse, and their opposition to such a move. The child will understand that the only reason to go to Sweden is to be with their father.

available in the country of habitual residence.[5] Our holding in Danaipour I does not stand for the proposition that every Article 13(b) analysis requires two such distinct prongs. In fact, Danaipour I specifically identified the limited role undertakings may play in certain situations. See Danaipour I, 286 F.3d at 21. Danaipour I also noted the great weight afforded to the State Department policy concerning undertakings in a situation involving child abuse:

> If the requested state court is presented with unequivocal evidence that return would cause the child a "grave risk" of physical or psychological harm, however, then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context would embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception.

Id. at 25 (quoting Department of State Comment on Undertakings). The district court properly followed Danaipour I's mandate; its finding of the existence of sexual abuse and that the return of the children to Sweden would result in a grave risk of psychological harm was adequate to satisfy the Article 13(b) exception, and no

---

[5] Danaipour also relies heavily on a footnote in Blondin for the proposition that assessing the capacity of the courts of the country of habitual residence is a prerequisite to an Article 13(b) exception. 238 F.3d at 163 n.11. We do not read Blondin to require the court to make findings about the institutional capacity of the home country in all cases. To the extent that Blondin does stand for such a proposition, we disagree that Article 13(b) requires such findings in all cases.

further inquiry into remedies available to the Swedish courts was required.

## IV.

For these reasons we **<u>affirm</u>** the judgment of the district court.