New York State Police v K.L. (2025 NY Slip Op 25267)

[*1]

New York State Police v K.L.

2025 NY Slip Op 25267

Decided on December 12, 2025

Supreme Court, Ulster County

Schreibman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 12, 2025
Supreme Court, Ulster County

New York State Police, Petitioner,

against
K.L., Respondent.

Index No. 2025-XXX

LETITIA JAMES
Attorney General of the State of New York
Attorney for Petitioner
44 Hawley Street, 17th Floor
Binghamton, New York 13901-4433
By: Kevin Cheung, Assistant Attorney General

Julian D. Schreibman, J.

This is a special proceeding seeking entry of an Extreme Risk Protection Order ("ERPO") against respondent K.L., a child. Petitioner New York State Police ("NYSP") is represented in this proceeding by the Office of the New York State Attorney General ("OAG"). Upon the disposition of the underlying petition, the Court, on its own motion, directed OAG to show cause why it should not be sanctioned for engaging in frivolous litigation conduct. In response, OAG made a written submission and was heard at a lengthy oral argument. The Court also accepted hundreds of pages of supplemental materials. (See Czajka v Dellehunt, 125 AD3d 1177, 1184-85 [3rd Dept. 2015][factual record for sanctions decision should be fully developed]). Upon review of the complete record, the Court finds that OAG engaged in frivolous conduct as defined in 22 NYCRR §130-1.1. However, in the exercise of its discretion, the Court declines to impose a monetary sanction on OAG.
I. The ERPO Statute
A. Purpose
A fundamental responsibility of any government is to assure the safety of its citizens. The State of New York pursues this obligation through a broad range of public safety laws and institutions. Among the dangers from which New York seeks to protect its residents is the [*2]scourge of gun violence. New York has adopted a panoply of laws and policies, both criminal and civil, which seek to suppress deaths and injuries from guns. "New York addresses gun violence with a combination of gun control measures, community-based interventions, and enforcement coordination. . . . This comprehensive approach reflects New York's commitment to protecting communities."[FN1]
The State's Division of Criminal Justice Services ("DCJS") maintains a website that catalogs the numerous laws that contribute to gun safety for New Yorkers.[FN2]

It is reasonable to infer that these extensive efforts are a reason for New York's comparatively low rate of gun violence, relative to other American states. In 2018, according to the U.S. Centers for Disease Control ("CDC"), New York suffered 821 deaths from gunshot injury, for a rate of 4.1 per 100,000 people. This was the fourth lowest rate in America. By comparison, the rate of firearms death in neighboring Pennsylvania was more than three times higher.[FN3]

As part of its efforts to further ameliorate the risks posed by firearms, in 2019, the State enacted Article 63-A of the Civil Practice Law & Rules ("CPLR"). Often referred to as the "Red Flag Law," Article 63-A created ERPOs. Although an ERPO is a "Protection Order," it does not limit where the subject can go or with whom he or she can associate. Rather, an ERPO does one thing: it prohibits the subject from possessing or acquiring firearms for up to one year.
Significantly, the Red Flag Law is not addressed only to criminal gun violence but also encompasses the goal of reducing suicide by firearm. Of the 821 gunshot deaths in 2018, 445 were suicides — nearly 100 more than gun homicides.[FN4]
"The Red Flag Law seeks to keep guns out of the hands of persons who may be suffering from acute emotional trauma or a mental health crisis and are at risk of harming themselves or others." (Haverstraw Town Police v C.G., 79 Misc 3d 1005, 1009 [Sup.Ct. Ulster Cty. 2024]).
B. Mechanics
The process of seeking an ERPO generally begins when a petitioner applies for a temporary ERPO ("TERPO"). The Red Flag Law limits who can petition for a TERPO to certain categories of persons including family members, teachers, health care providers and law [*3]enforcement. In practice, substantially all TERPO applications are made by law enforcement. A TERPO application can be brought ex parte but must be commenced in the County in which the respondent resides. (See CPLR §6341).
A court "may" issue a TERPO "upon a finding that there is probable cause to believe the respondent is likely to engage in conduct that would result in serious harm to himself, herself, or others," as those terms are defined in the Mental Hygiene Law ("MHL"). The court "shall" consider "any relevant factor," but must consider seven statutorily enumerated "acts of the respondent." (CPLR §6342[2]). By law, a court must adjudicate a TERPO petition "on the same day" that it is filed. (CPLR §6342[1]).
Whether the TERPO is granted or denied, the court must schedule an evidentiary hearing to determine whether to issue a "final" ERPO. While the factors to be considered are the same, the petitioner's burden of proof at the ERPO hearing is higher than at the TERPO stage. To obtain an ERPO, the petitioner must still establish that the respondent is likely to engage in conduct that would result in serious harm to the respondent or others, but the petitioner must prove this by clear and convincing evidence. (CPLR §6343[2]). At the hearing, the court may consider "any evidence" submitted by either side, along with the sworn petition itself, and a statutorily-authorized background report prepared by the relevant law enforcement agency.
As noted, the Red Flag Law is one of many legal tools used by the State of New York to reduce gun violence, each with its own scope and application. The Red Flag Law does not address any weapons other than firearms, nor is it the vehicle through which affirmative mental health or other services can be delivered to a person in crisis. The power of a court adjudicating a Red Flag Law petition is limited to separating the respondent from firearms by issuing an ERPO. Even that power is limited because the Red Flag Law does not prohibit the presence of firearms in the home of the respondent if those guns lawfully belong to another person.
C. 2022 Expansion
The enactment of the Red Flag law was not met with a flood of petitions. However, on May 14, 2022, a racially motivated mass shooting in Buffalo left ten Black New Yorkers dead. In the wake of this massacre, on May 18, 2022, Governor Kathy Hochul issued an Executive Order titled, "Directing the State Police to File Extreme Risk Protection Orders" (the "Executive Order"). The Executive Order contained four "whereas" clauses, which set forth the Governor's findings that motivated its issuance:
WHEREAS, violence with firearms remains the most deadly tactic deployed by domestic extremists, with violent white supremacist extremists inspired by "replacement theory," carrying out deadly shootings targeting a Pittsburgh, Pennsylvania synagogue in October 2018; a Poway, California synagogue in April 2019; and an El Paso, Texas Walmart in August 2019;
WHEREAS, 10 people were killed with a semiautomatic rifle equipped with high-capacity magazine in an act of white supremacist domestic terrorism in a shooting on March 14, 2022 at a Buffalo, NY supermarket, demonstrating the need for increased vigilance to prevent, whenever possible, similar tragedies from occurring in the future;
WHEREAS, the number of domestic extremist attacks and plots have more than tripled [*4]from 2011 to 2021, according to the Center for Strategic and International Studies, with more than "38 white supremacist and other like-minded terrorist attacks and plots" in 2021; [and]
WHEREAS, the foregoing requires decisive and immediate action to protect the public from this escalating, frequently occurring threat in the State of New York. (Affirmation of Assistant Attorney General ["AAG"] Kevin Cheung in Response to Order to Show Cause, February 20, 2025 ["Cheung Aff."], Exhibit 9).
The Executive Order directed that NYSP personnel be trained on how to use the Red Flag Law and directed that they "must file" a TERPO application "when there is probable cause to believe the respondent is likely to engage in conduct that would result in serious harm to himself, herself, or others, as defined in paragraph one or two of subdivision (a) of section 9.39 of the mental hygiene law." While this threshold is no lower than that set forth in the statute, and indeed simply quotes the statutory language, the change brought about by the Executive Order was to eliminate any discretion on the part of NYSP: when a sworn NYSP member concludes that those circumstances are present, NYSP "must file" for a TERPO.
Although the Governor's Executive Order was directed at a serious and specific problem — racially-motivated terrorism — the greatly expanded use of the Red Flag Law by NYSP and OAG has not been so focused. In particular, while the Red Flag Law borrows its key terminology from section 9.39 of the MHL, there is another section of that law that is used by law enforcement and that has come to intersect substantially with the Red Flag Law. Under MHL §9.41, a law enforcement officer "may" take an individual into custody, in the absence of any criminal wrongdoing, and transport them to a hospital for the purpose of an emergency mental health evaluation if that person "appears to be mentally ill and is conducting themself in a manner which is likely to result in serious harm to the person or others." (MHL §9.41[a] [emphasis added]). Despite use of the permissive language "may" and the two-pronged standard for determination of eligibility, in this Court's observation through numerous ERPO proceedings, NYSP's threshold for compelling an individual, against their will, to be transported to a mental health facility is objectively low, encompassing anyone who makes an unguarded or off-hand statement that might be interpreted as evidencing suicidal ideation. In turn, in reliance on the Executive Order, NYSP has pursued a policy by which a TERPO application is filed against every person who is transported for an MHL §9.41 evaluation on the basis of purported suicidal ideation. (Cheung Aff., Ex. 6, Transcript of ERPO Hearing, 16).
As a result of these policies, since the Executive Order, there has been a sharp increase in the filing of TERPO applications,[FN5]
 with a significant portion of these directed at at-risk persons including troubled children, senior citizens, persons with serious chronic illnesses, and [*5]individuals processing trauma through acts of non-suicidal self-harm such as "cutting." Since the Executive Order was issued, more than 17,000 New Yorkers have been found by a court to be likely to seriously harm themselves or others.[FN6]
In this County, it has been the Court's experience that, in the majority of cases, the respondent does not possess any firearm, and has no intention of doing so, so that even when the TERPO or ERPO is granted, no firearms are confiscated and neither the respondent nor the public are made any safer. Instead, the aggressive pursuit of ERPOs simply raises the prospect of further traumatizing the respondent. This is such a case.
II. The Case Against K.L.[FN7]
On the evening of January 27, 2025, respondent K.L., who had turned 11 years old just two weeks prior, had the following text exchange with a friend:[FN8]

K.L.

"B"[FN9]

About hanging myself I might still do it but idk probably not idrk don't tell [b]

Don't pls

Idk I might why do you care

 Don't you hate me

 DON'T TELL [B]

Don't I like you as a friend

 I mean I do

 Sorry

Oh everyone says that you say you hate me

Don't believe in rumors

But I might do it everyone hates me my own parents hate me my life is so hard I always seem so happy but under that im just sad and wanting to kill myself I've attempted to kill myself 19 times my life is so hard

[B appears to have responded with a smiley 

 face and thumbs up emojis]

K.L's friend "B" showed these texts to his mother who then contacted law enforcement. NYSP troopers responded first to B's house, where they interviewed his mother and reviewed the text messages, and then to K.L.'s house.
According to NYSP's investigative report, troopers "interviewed [K.L.] in the presence of her parents. . . . [K.L.] made no comments of self harm, or displayed any suicidal ideation in our presence."[FN10]
(Cheung Aff., Ex. 2 [emphasis added]). Nevertheless, NYSP took K.L. into custody for a mandatory psychiatric evaluation. K.L. was transported, alone, in the back of a police cruiser for the 45-minute ride to the hospital, with her mother following in a separate vehicle. Meanwhile, upon a voluntary search, NYSP concluded that there were no firearms in K.L.'s home; nevertheless, NYSP brought a TERPO petition against K.L.
This Court denied the TERPO and made the following findings of fact in connection with that determination:
Respondent is barely 11 years old. The application is based solely on text messages sent by the child to another child. No other information, including statements from the child's parents, are provided to corroborate the respondent's veracity or the circumstances of her communications. No medical or educational history has been provided. The evidence does not rise to the level of probable cause that the respondent is likely to engage in conduct that would cause serious harm to herself or others. (Cheung Aff., Ex. 5).
As required by statute, the Court scheduled a prompt evidentiary hearing for February 6, 2025, to determine whether to issue a final ERPO.
Respondent did not appear at the hearing, despite service of notice on her mother. As this Court has elsewhere held, pursuant to the Court of Appeals' binding interpretation of identical, relevant language in a similar statute (see In re K.L., 1 NY3d 362 [2004]),[FN11]
an ERPO may not be granted on default or consent. (Kelly v E.R., 84 Misc 3d 555, 560 [Sup.Ct. Ulster Cty. 2024]). In any event, an infant cannot default in a civil proceeding. (CPLR §1203). Accordingly, the Court proceeded with an evidentiary hearing in K.L.'s case.
At the hearing, two additional statements by K.L. on the night of the incident were offered into evidence. First, according to the responding trooper, when confronted by her parents about the text messages, K.L. said, in sum and substance, "sometimes I say dumb things."[FN12]
Second, according to the trooper who transported her to the hospital, at some point during that trip he asked K.L. whether she was thinking of hurting herself and she responded, in sum and substance, "I don't know." Otherwise, the proof presented was identical to that submitted with the TERPO application. At the conclusion of the hearing, the ERPO was denied and a written decision subsequently issued. (NYSP v K.L., February 10, 2025 Decision, Sup. Ct. Ulster County; Index No. 2025-XXX [No. Redacted] ["K.L. Post-Hearing Decision"]).
III. Pursuing the ERPO Against K.L. was Legally Frivolous
Part 130 of the Rules of the Chief Administrator of the Courts authorizes a court to make a finding that a party or counsel has engaged in "frivolous conduct" and, if the court concludes it is appropriate, to impose a monetary sanction. (22 NYCRR s.130-1.1). Conduct is frivolous if, inter alia, "it is completely without merit[.]" (Id.).
In determining whether the conduct undertaken was frivolous, the court shall consider, among other issues (1) the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct; and (2) whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party.
(Id.). In assessing whether OAG has engaged in frivolous conduct within the meaning of Part 130, the Court has also examined the guidance provided by Rule 3.1 of the Rules of Professional Conduct. That rule is addressed to "Non-Meritorious Claims and Contentions" and provides that a lawyer "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous." The Rule goes on to define frivolous conduct as advancing a claim "that is unwarranted under existing law[.]" (22 NYCRR Part 1200.0, rule 3.1). The Comment to Rule 3.1, although non-binding, is instructive in that it explains that it is not frivolous to bring a claim "merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Lawyers are required, however, to inform themselves about the facts of their clients' cases and the applicable law, and determine that they can make good-faith arguments in support of their clients' position." (22 [*6]NYCRR Part 1200.0, rule 3.1, Comment 2 [July 2025]). Notably, in this matter, as is usual in ERPO proceedings initiated by the NYSP, the TERPO application was filed ex parte by NYSP directly, without consultation with OAG. OAG did not appear in the matter until after the TERPO had been denied and both the evidentiary deficits and the age of the respondent had been highlighted by the Court.
As the Court summarized at oral argument, the Court's sua sponte motion was premised on the confluence of three factors in this case: (1) that no relief could be granted by the Court beyond restrictions already in place by operation of law; (2) the lack of evidentiary support for the petition under the applicable legal standard; and (3) the vulnerability of the respondent.
A. An ERPO Could Not Protect K.L. from Firearms More Than Existing Laws Applicable to All 11-Year-Olds
It is illegal in the State of New York for an 11-year-old child to handle a firearm, much less to possess or own one. Indeed, the State makes it illegal for anyone under the age of 16 to possess a gun of any kind. (Penal Law ["PL"] §265.05) "A person who violates the provisions of this section shall be adjudged a juvenile delinquent." (Id.). In short, before any ERPO petition was brought, K.L. was legally barred from possessing any gun.[FN13]

As stressed by OAG, the law does exempt from the under-16 prohibition the possession of a shotgun or rifle by the holder of a duly-issued hunting license. As discussed further below, however, under New York's Environmental Conservation Law ("ECL"), the youngest a person may be issued a hunting license is age 12. Thus, the foregoing provisions establish that there is a blanket prohibition, without exception, on 11-year-olds possessing firearms of any kind. In light of that comprehensive legal bar, it is plainly "unwarranted under existing law" to seek an ERPO against an 11-year-old child.
In defense of pursuing the ERPO against K.L. despite these laws, OAG advances two arguments. First, it contends that although K.L. cannot have guns and her home cannot be made gun free, the issuance of an ERPO would subject her parents to heightened storage requirements (in the event they ever purchased a gun) and therefore the ERPO could promote K.L.'s safety, at least indirectly. To be sure, Penal Law §265.45[1][ii] makes it a crime for a person to leave a firearm out of their immediate control, without having securely locked it in a gun storage device or rendered it inoperable by use of a gun lock, if that person resides with an individual who is the subject of an ERPO. Accordingly, under this provision, if an ERPO were entered against K.L. and her parents acquired a gun, the failure to store it in compliance with this provision could subject them to criminal prosecution.
OAG emphasized this point at oral argument. In response to the Court's observation that an ERPO would not prevent K.L.'s parents from purchasing multiple guns, OAG argued: "[I]f they purchased those firearms they would have to store them in a secure location, in a safe, locked away from K.L. whereas if there were no ERPO in effect, in theory, they could just leave it out because she would be allowed to be around guns." (Transcript of Oral Argument, March 14, 2025, ("Tr.") 89 [emphasis added]). Similarly, OAG argued, "[An ERPO] probably also creates a situation where if that parent or guardian allows a gun to get into the hands it does probably create a hammer over that individual's head criminally, more so than it would be if it was a negligent situation." (Id. 95; see also id. 116 ["[An ERPO] does limit her access if there are firearms in the house."]).
OAG's argument is flatly wrong. Having an ERPO in place against a child does not create or increase the parents' criminal liability for improper weapons storage. The reason is the sub-section of law immediately preceding the one cited by OAG. Penal Law §265.45[1][i] imposes exactly the same responsibilities for safe storage and criminal consequences for non-compliance on any gun owner who lives with a person who "is under eighteen years of age." In other words, entry of an ERPO against a child affords no additional safety because the adults in the household are already subject to the same safe storage requirements; contrary to OAG's argument, K.L. is not "allowed to be around guns" in the absence of an ERPO. Therefore, the safe storage requirements applicable to ERPOs do not make K.L. any more safe than she was and do not make the pursuit of an ERPO against her any less "unwarranted."
The Court is troubled by the fact that, in the context of arguing that it had not engaged in frivolous conduct, OAG relied on a facially erroneous argument founded on omitting six words from the applicable statue. (See, PL §245.45[1]).
OAG's second argument that an ERPO against K.L. would achieve some purpose is her future eligibility for a hunting license when she turns 12, which would happen shortly before the [*7]expiration of the ERPO that OAG sought. While technically true, this is too fragile a reed to support OAG's vigorous pursuit of an ERPO against a child, 11 months in advance. A 12-year-old child cannot obtain a hunting license on their own. Such a license may only be issued if the minor is accompanied at the time of their application by a parent who consents and signs the license. (ECL §11-0713[2]). Even with such a license, a person aged 12 or 13 may hunt only when accompanied by a parent or an adult who has been given written authorization to supervise the youth. (ECL §11-0929[1]). In short, the issuance of an ERPO in February 2025 would, at most, prevent K.L.'s parents, in January 2026, from consenting to her obtaining a junior hunting license. OAG has not presented any good faith basis to suggest that K.L. or her family have any intention of pursuing such a license. As noted, there is no evidence that K.L.'s family have ever owned guns, much less hunted.
Furthermore, to the extent this was a genuine concern — and there is nothing in the record to suggest that anyone involved in bringing or pursuing this proceeding actually considered it contemporaneously — it militates against bringing the ERPO as an emergency proceeding and instead waiting until closer to K.L's 12th birthday, which would have permitted NYSP/OAG to conduct a more complete inquiry into the need for an ERPO. In the context of reviewing an ERPO petition, the Court is encouraged to consider the recency of concerning behavior, with "recent" defined as within the six months preceding the application. (See CPLR §6342[2]). Accordingly, any delay to determine whether K.L. might be inclined to obtain a junior hunting permit (or was otherwise in need of an ERPO) would not have undermined the weight of the application.
Similarly, OAG's reference to the legislative history does not support the proposition that the Red Flag Law, as passed, has any application to children of this age. For example, in the Assembly minutes submitted by OAG, an Assemblymember endorses the application of the Law to 16 or 17 year-olds under the belief that a judge either could order the seizure of guns owned by the minor's parents (relief not authorized in the statute) or that the safe storage provisions would provide additional security (which, as explained above, in the case of minors they do not). (See Supplemental Letter Submission of AAG Kevin Cheung ["OAG Letter"], April 2, 2025, Exhibit 5, p.53; see also id., Ex. 6, p.57 [questioning the limited utility of making persons under age 16 subject to ERPOs]).
In sum, there appears to be no meritorious basis to pursue an ERPO against an 11-year-old child and OAG has not identified any legitimate safety objective that would be achieved on behalf of her or the public.
B. OAG Ignored the Applicable Evidentiary Standard
The foregoing analysis suggests that a proceeding to take guns away from an 11-year-old is, essentially by definition, without merit in law, and that such a proceeding against respondents under the age of 16 will often be of dubious merit. OAG, however, routinely seeks such orders, and in defense of its conduct here has cited nine specific cases with "similarly aged" respondents as well as statistics for an even larger number of orders obtained against persons under 18. (See Memo of Law, 16 n.14; OAG Letter, Ex. 1). A review of these "similar" cases, however, reveals significantly more serious factual concerns and more extensive evidence than was presented here.
The youngest respondent, aged 11, made multiple suicidal comments to school officials including the specific statement that they intended to "go home, get the gun from under mom's bed, and shoot myself." There was, in fact, a gun in the home. Another case where there were guns present in the home involved a 12-year-old who was found hanging from a shower rod by their shoelaces. Another involved a 12-year-old who actually brandished a firearm, while others involved [*8]teenagers' express threats to commit school shootings. The evidence in these cases often included multiple statements from other students and, in one case, an affidavit from the respondent's CPS case worker. While an order purporting to prohibit these children (as opposed to the adults in their lives) from possessing guns still might have very limited utility, at least the across-the-board approach to their safety is understandable and the supporting evidence reflects the gravity of the situation.
In this case, however, the frivolous nature of OAG's conduct is further emphasized by the almost complete lack of competent evidence in support of the ERPO, much less clear and convincing evidence.
Indisputably, merely pursuing a weak claim is not frivolous. Courts cannot punish advocates for litigating a claim that has a small chance of success. But this principle does not give lawyers carte blanche to bring any claim, however specious. As the comment to Rule 3.1 explains:
The filing of a claim or defense or similar action taken for a client . . . is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however . . . if the lawyer is unable . . . to make a good-faith argument on the merits of the action. (22 NYCRR §1200.0, rule 3.1, Comment 2 [July 2025]).
While attorneys are appropriately given wide latitude in pursuing — or at least initiating — dubious claims, the courts of New York are not an evidentiary free for all. Counsel are expected to understand applicable evidentiary standards and to evaluate and prepare each case in light of applicable law.
The Red Flag Law requires that a petitioner prove its case — that the respondent is likely to engage in conduct that would cause serious harm to themselves or others — by clear and convincing evidence. (CPLR §6343[2]). Our high court has recently emphasized that clear and convincing evidence is "the most demanding burden in the civil legal system." (Matter of K.Y.Z., —N.E.3d—, 2025 WL 2955728 at *6 [2025]). Clear and convincing evidence "is neither equivocal nor open to opposing presumptions." (In re Duane II, 151 AD3d 1129, 1131 [3rd Dept. 2017]). Indeed, the standard "forbids relief whenever the evidence is loose, equivocal or contradictory." (Matter of K.Y.Z. at *10 [quoting Matter of Westchester Med. Ctr. (O'Connor), 72 NY2d 517, 529 [1988]). In particular, while reliable hearsay may be used to support a finding under this standard, where such out of court statements "are equivocal or inconsistent, and not substantiated by other proof, they do not rise to the level of clear and convincing evidence." (People v Dominie, 42 AD3d 589, 591 [3rd Dept. 2007]; see also People v Stewart, 61 AD3d 1059, 1060 [3rd Dept. 2009][child's equivocal hearsay statement was not clear and convincing evidence]). As in the Red Flag Law, this standard generally applies when a person's rights are imperiled due to concerns about their mental well-being. As the United States Supreme Court articulated when explaining why it would impose a clear and convincing standard to cases of involuntary civil commitment:
At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is a risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered.
(Addington v Texas, 441 U.S. 418, 426-27 [1979]).
Here, petitioner NYSP believed that K.L. might suffer from a mental illness. We know this because they took her into custody for an involuntary mental health evaluation and NYSP has no lawful authority to do so unless they conclude that the subject "appears to be mentally ill." (MHL §9.41[a]).
At the ERPO hearing, petitioner did not present a scintilla of medical evidence regarding K.L's mental health, either from medical professionals or from family or community members familiar with K.L.'s personal history and circumstances. While the Court did indeed identify this evidentiary chasm in its decision on the ERPO, OAG wrongly claims that this Court has imposed an "evidentiary mandate" requiring the presentation of medical evidence. OAG's error is grounded in a misreading of both the Red Flag Law and controlling precedent.
Both in its briefing and at oral argument, OAG insists that the Second Department's decision in R.M. v C.M., 226 AD3d 153 [2nd Dept. 2024], "rejected any requirement of expert witness testimony for an ERPO," (Memo of Law, p. 19), and that in focusing on the absence of such evidence in this and other cases, this Court is failing to follow R.M.'s holding. OAG is mis-stating the holding of R.M.
R.M.'s holding is that the Red Flag Law is not facially unconstitutional despite the Legislature not mandating expert medical testimony in all ERPOs. Citing to this Court's decision in Haverstraw, supra, and others, the R.M. court explained that expert medical testimony was not constitutionally required because the Red Flag Law "is not confined to mentally ill people." (226 AD3d at 162). Indeed, the respondent in R.M. was not alleged to be mentally ill; that ERPO application arose out of the respondent's alleged brandishing of a firearm during an argument with a neighbor. (Id. at 156). R.M.'s chain of reasoning is unequivocal: because not all ERPOs involve allegations of mental illness, therefore not all ERPOs require a finding of mental impairment, and, therefore, "[s]ince a finding of mental impairment is not required, expert medical testimony is not required." (Id at 162). To the extent that the R.M. decision can be read to be saying anything about the quantum of proof required when mental health is placed in issue in an ERPO, the implication of its language is that expert medical testimony generally will be necessary. (Id.). Consistent with R.M., this Court has never required expert medical testimony, but has reiterated, as it did in the underlying decision following the hearing in this case:
while such evidence is not statutorily mandated, as a practical matter where an ERPO is based on a respondent's mental health, a petitioner will be hard-pressed to demonstrate what a respondent's likely future conduct will be without some form of medical evidence.
(K.L. Post-Hearing Decision at 3 (citing Maxwell v D.L., 2024 NY Slip Op. 51526[U], 2024 WL 4797277 [Sup.Ct. Ulster County 2024]).
Contrary to R.M.'s cogent explanation of the statutory structure, OAG nevertheless insists that the Legislature intentionally dispensed with any medical evidence requirement in order to render ERPO hearings "summary proceedings." Therefore, it argues, the Court is improperly increasing the burden on ERPO petitioners by expecting such evidence in cases like this. OAG is mistaken.
As a starting point, OAG's use of the term "summary proceeding" appears to stem from its misapprehension that ERPOs are governed by Article 4 of the CPLR ("Special Proceedings"). (Memo of Law, 20). To be sure, the Red Flag Law creates one of many types of special proceedings [*9](i.e., not "actions") that exist under New York law, but OAG cites nothing in support of its apparent view that Article 4's procedures somehow trump those specifically laid out in Article 63-A. In any event, even under Article 4, a court may only make a summary determination — that is, one based solely on the written submissions — "to the extent that no triable issues of fact are raised." (CPLR §409[b]). The Red Flag Law specifically requires an evidentiary hearing to allow the court to make findings of fact. Accordingly, the Red Flag Law's plain terms preclude a "summary" determination.
OAG further argues that the Legislature intended "summary" treatment of ERPO hearings because an expectation of mental health or education records is "impractical and unnecessary." (Memo of Law, 20). OAG notes that "[t]he time frames in which to hold a hearing under the ERPO statutes are short . . . [and] [a]lthough this Court enumerated various types of evidence that it believed should have been adduced at the hearing, the short time periods make it impractical to obtain some or all of this evidence." (Id.).[FN14]

OAG elaborated on this point at oral argument:
AAG Belka: I think that the statutory requirements, that turn around of three to six business days, indicates that the legislature does not want to turn these into anything other than summary processes whereby the Court reviews the evidence presented and makes a ruling based on the factual evidence before it.
* * *
The Court: I have always read the six day requirement . . . to ensure that the respondent, who may have had their guns taken away and an order entered against them, gets their day in court quickly, not that the legislature decided that the petitioners should be able to get a summary proceeding on limited evidence and get an order entered. What's your basis for believing that?
AAG Belka: Oh, I think it's both things, your Honor . . . .
So the petitioner is bound in a granted TERPO three to six business days. That is not practicably a — a sufficient amount of time to acquire school records, medical records. It just simply isn't. The number of cases that can be filed, it just — it is not enough time practicably.
I believe it is both things, your Honor. It is both due process for the respondent and it is an indication that the legislature did not want to turn these into extended proceedings with —
AAG Marcus: Experts.
AAG Belka: — experts and subpoenas and medical records that might inform the facts.
(Tr., 44-45). OAG's repeated reference to a Court's ability to simply determine the facts is an imprecise framing of the evidentiary question in an ERPO hearing. While a Court must make findings that support its decision, the question that the statute puts to a Court is not to describe a respondent's past conduct but to make an evidence-based prediction about the respondent's future conduct.
In the post-hearing OAG Letter, OAG claims that "the legislative history of the ERPO statute substantiates that ERPO hearings would be summary proceedings." (OAG Letter, 3). In support of this contention, OAG then cites to 2017 remarks by the Red Flag Law's sponsor, Assemblymember Brian Kavanagh, quoting the Assemblymember as saying that the three to six day turnaround to a hearing was "a very fast timeframe for this kind of thing in New York State." (OAG Letter, 2). OAG's use of this partial quotation to support the idea of "summary proceedings" is misleading. What the Assemblymember actually said was:
The hearing standard is within three to six business days, which is a very fast timeframe for this kind of thing in New York State. It's three to six business days. Within that time, unless the respondent sought additional time to prepare for the hearing, the respondent would be able to face the evidence that's presented to them. They would have a right to be represented by counsel and they would proceed — you would proceed then to have a full hearing on the question.
(OAG Letter, Ex.4, p.45 [emphasis added]). Other portions of the legislative history provided by OAG reinforce this point. In the Assembly, when questioned about the fact that an ERPO brought by law enforcement might be based solely on hearsay, Assemblymember Simon explained that a witness with personal knowledge might be "very fearful and has observed firsthand, but doesn't want to be the applicant themselves, the petitioner. But, in fact, that person may be called to testify at a hearing, because there will be a hearing. Because in our bill, due process is protected from the very beginning[.]" (OAG Letter, Ex.5, p.40 [emphasis added]).
OAG's inference as to the Legislature's intent is not only contradicted by the very evidence it cites, it is also belied by the fact that the Legislature has imposed similarly tight time constraints on similar proceedings, with even greater burdens.
In particular, under MHL §9.60 ("Kendra's Law"), where a petition is filed to place an individual on Assisted Outpatient Treatment ("AOT"), the hearing — at which respondent must be represented by counsel — must be held within three days. The petitioner is required to prove facts by clear and convincing evidence and to present the testimony of an examining physician addressing multiple, mandatory topics. There are no "summary" AOT proceedings. (Matter of K.L., 1 NY3d at 373; see Matter of Gracie Sq. Hosp. v Jesglar C., 43 Misc 3d 638, 640 [Sup.Ct. NY County 2014][noting requirement of full-blown AOT hearings, even where respondent consents to the order]; see also Matter of Joseph O., 245 AD2d 856, 857 [3rd Dept. 1997][upholding denial of petition for medication over objection, noting "high standard of proof [clear and convincing evidence] necessary to establish incapacity"]).
Similarly, where an individual seeks release from involuntarily commitment at a mental health facility, they may request that a hearing be held, in the county where they live or the county where they are held, within just five days. (MHL §9.31). At that hearing, although requested by the patient, it is the facility's burden to prove, by clear and convincing evidence, that the individual presents "a substantial threat of physical harm to himself or others due to mental illness[.]" (See Charles T. v Sanchez, 215 AD2d 235 [1st Dept. 1995][finding that expert testimony from psychiatrist who had "little firsthand knowledge of the petitioner's psychiatric condition" did not meet statutory burden]; In re Howard U., 147 AD3d 1284, 1285 [3rd Dept. 2017][closely reviewing sufficiency of expert testimony on element of substantial threat of harm to self or others]; see also Losch v Berman, 61 AD2d 902, 902 [1st Dept. 1978][testimony of guardian ad litem who had only had one interview with subject was not clear and convincing evidence of substantial impairment to support [*10]appointment of conservator)].
As for medical or educational records, the Court is skeptical that OAG cannot obtain critical evidence in short order, especially when empowered by a court-ordered, forthwith subpoena, that would presumably be issued contemporaneously upon request. Neither in this case, nor any other case this Court can recall, has the Court been asked by OAG to sign such a subpoena. Nevertheless, giving OAG the benefit of the doubt on this point, in light of the fact that respondent here is a child, the same records could have been obtained through an authorization signed by the parents (or perhaps even from the parents' own files or access to patient portals). OAG did not explore this option either. 
In any event, as the Court has noted, evidence about a respondent's mental health may be introduced through means other than medical records or expert testimony. A respondent may themselves provide testimony or a respondent's family members may well be able to elucidate the mental well-being of a respondent. This Court has relied on family member testimony of mental illness in other ERPO cases. (See NY State Police v R.D., 2025 NY Slip Op. 51216(U), 2025 WL 2203097 at *4-5 [Sup.Ct. Ulster County 2025][respondent and adult child both testified to respondent's mental health history]). As reviewed at oral argument, OAG pursued no such evidence in this case.[FN15]

The Court: The concerns about timing don't apply when you simply want the testimony of the parents. The parents were not subpoenaed to testify at the hearing, correct?
AAG Cheung: No, they were not subpoenaed, your Honor.
The Court: And there weren't even written statements obtained from the parents at any time during this, correct?
AAG Cheung: No. Their statements would have only been to the troopers and then recorded on the body cams that were reviewed by Mr. Dorado.[FN16]
The Court: It is common to get a written deposition from witnesses, isn't it?
AAG Cheung: Yes, if they have direct knowledge as far as the incident goes where I don't believe the parents were privy to the messages until after being advised by the troopers that these were made.
The Court: You don't think that the parents would be privy to whether their child attempted suicide 19 times in the past?
AAG Cheung: That was not asked, your Honor, of them —
The Court: I guess my question is why not?
AAG Cheung:— but I imagine that would be something that they'd know.
(Tr., 50-52).
OAG's approach to the marshalling of evidence in this case is best summed up by the following exchange:
The Court: [H]aving seen that the TERPO was denied, a decision-making process occurred at which it was decided not to attempt to gather additional evidence?
AAG Cheung: Yes, Judge.
(Tr., 38).
As a result of this approach, the only evidence presented by OAG at the ERPO hearing in this case were the out of court statements of a barely-11-year-old. Moreover, those statements, quoted in full, supra, are the very definition of equivocal, precluding relief. (Matter of K.Y.Z. at *10). OAG nonetheless insists that the proof tendered satisfied its burden of showing by clear and convincing evidence that this child was likely to engage in conduct that would result in serious harm to herself and that the Court erred in denying the petition. OAG made clear that it would not change anything about how K.L.'s case was handled or pursued. (See, e.g., Tr., 37 [AAG Belka: "I don't believe that anyone felt that this was a facially insufficient ERPO at any point; either at the TERPO denial stage or at the ERPO denial stage."]; Tr., 119 [The Court: "My concern here is that you had a case with essentially no evidence that could achieve nothing and went forward with a potentially traumatizing effect anyway." AAG Belka: "I disagree with all of that."]).
It is apparent that OAG failed to tender any meaningful evidence in support of the petition not because it lacked the time, but because it lacked the interest. OAG's cavalier attitude to the statutorily imposed burden of proof is, in this Court's view, demonstrative of frivolous litigation conduct, especially when coupled with the fruitless nature of the claim itself.
C. Pursuing a Meritless ERPO Against a Child Needlessly Risks Further Injury
22 NYCRR Part 130 also defines as frivolous conduct actions taken "to harass or maliciously injure another." OAG acknowledges that going through an ERPO proceeding carries a real risk of retraumatizing a vulnerable person. (See, e.g., Tr., 99-100). OAG has prosecuted ERPOs in this Court involving respondents who are in tears or who bring family members for emotional support or even case workers with them to court. Until respondents are in court, they may not realize that they are not being charged with a crime; this Court's chambers has fielded calls from respondents worried that they will be jailed if they cannot appear at the hearing. Needless to say, such consequences should not deter pursuing valid ERPOs. In this Court's observation, however, almost universally, including in this case, ERPOs brought against vulnerable persons do not involve any guns, nor even the contemplation of acquiring a gun.
There is nothing in the record to show that in preparing this case OAG either considered the potential impact on K.L., or took any obvious steps consistent with having a genuine concern for the welfare of an emotionally fragile child. For example, at oral argument:
The Court: Was the potential impact on her ever considered by the Attorney General's Office during the preparation and presentation of this hearing? Was that a factor you considered?
AAG Cheung: I wouldn't say it was a dispositive factor, necessarily, Judge, throughout the proceeding.
The Court: You're telling me there was a discussion internally, hey, it could be harmful to sue an 11 year old girl?
AAG Cheung: No.
AAG Belka: As it relates to this particular case?
The Court: Yeah.
AAG Belka: No. We have had those discussions internally as it relates to minors, different kinds of cases that we might pursue or not pursue as it relates to minor individuals, absolutely, we have had those discussions.
The Court: So why weren't they had in this case?
AAG Belka: Because they've been had. This particular case is one we would have gone forward with regardless of the prior discussions that we had as it relates to juveniles.
(Tr., 108-109 [emphasis added]).
This matter involves a child — a child who, for reasons still unknown, suggested she was contemplating suicide and had attempted suicide in the past. Moreover, her texts indicated that her expressed suicidal ideation derived, at least in part, from perceived mistreatment by her parents.
Notwithstanding the expressed concerns about her parents, and the acknowledged presence of other children in the home, at no time did anyone involved make a referral to Child Protective Services ("CPS") or, apparently, inquire whether there was any CPS or Family Court history. (See Cheung Aff., Ex. 6, Transcript of ERPO Hearing, 16-17). No such action was taken even when her parents failed, without explanation, to bring her to a court-ordered hearing.
Alternatively, to the extent OAG discredited K.L.'s stated concern about her parents (while simultaneously crediting her claim of 19 suicide attempts), they took no steps at all to determine whether her parents were in favor of bringing the ERPO or needed referrals to any other support services. Tellingly, to the Court's knowledge and as confirmed at oral argument, since the night NYSP drove her to the hospital in the back of a police car, no one from NYSP or OAG has ever followed up with her family to see if K.L. is ok.
Instead, in two recurring themes at oral argument, OAG referred to pursuing the ERPO as a "wake-up call" for the family and advocated for the need for K.L. to be held "accountable" for her conduct. It is not clear how proceeding to an ERPO hearing is a wake-up call in light of all that preceded it. The State Police showing up at your door at night with troubling texts sent by your child is a wake-up call. The State Police taking your child into custody for a psychiatric evaluation is even more of a wake-up call. There is nothing about the proceedings in this case to suggest that suing the child to remove non-existent guns could rationally have produced more alarm — except to the child herself.
The accountability argument is even more troubling. OAG argues that "there has to be some level of accountability of making statements such as this. . . . there needs to be some form of recognition that those statements should not be made because we do take those very seriously here in New York." (Tr.16-17 [emphasis added]). Is it really the objective of ERPOs to train children to suppress emotional trauma and refrain from communicating suicidal ideation?[FN17]
 As OAG noted, by transporting her to the hospital, NYSP was at least making available to her professional medical help. (Id.). Deciding, thereafter, to also sue her — and to continue that suit after a judge has cautioned that the evidence is lacking — provides no positive support. Rather, it communicates the dangerous [*11]message to a child that if you are feeling like you're going to hurt yourself, you'd better not say anything or you'll get in trouble. Indeed, such a fear is palpable in K.L.'s texts in which she repeatedly implores her friend "B," "don't tell."
The Court acknowledges that the AAG assigned to argue the matter may not have been prepared for this line of inquiry and may not have thought through the framing of this issue. To be fair, OAG may have been trying to say that a person shouldn't express suicidal ideation for some other reason. In full, the AAG's comments at oral argument with respect to K.L.'s claim to have attempted suicide 19 times were:
[W]hether or not that is in jest or, you know made to — made — a statement made to sound tough to other people in some way, shape or form, there needs to be some form of recognition that those statements should not be made because we do take those very seriously here in New York.
If that is the focus of OAG's accountability argument — that people shouldn't pretend to be suicidal to achieve other ends — two observations follow. First, an ERPO is still the wrong method of accountability: an individual who is not truly suicidal but makes suicidal statements to achieve some other goal is not actually "likely" to inflict serious harm on themselves. (See New York State Police v R.D., supra [denying ERPO where allegedly suicidal statements were made to manipulate police to respond to her home]). If the government wants to discourage such conduct, it must identify a more appropriate vehicle. Second, significantly, by noting that she might be joking or trying to sound tough, OAG's argument effectively concedes that K.L.'s texts are amendable to more than one interpretation; therefore, they cannot, standing alone, constitute clear and convincing evidence of her intent to self-harm. (People v Dominie, 42 AD3d at 591.)
To the extent OAG persists in advocating that an ERPO was warranted, OAG also fails to appreciate the impact of targeting her by stating that K.L. was "only asked to appear for one hearing date[.]" (Memo of Law, 22). As noted above, even one hearing, and the build-up to that hearing, can be anxiety-inducing and traumatic. OAG argues that any retraumatization of a respondent at a hearing is often this Court's fault for refusing to enter ERPOs upon OAG's consent form and thereby "removing a key tool from the prosecution of these cases." (OAG Letter, 2). To begin with, the Court requires hearings because the statute requires hearings. (Kelly v E.R., supra). As for consents, the Court has indicated that if a respondent is prepared to state on the record that they meet the statutory criteria, i.e., that they are feeling as though they want to hurt themselves or others, the Court considers this to satisfy the petitioner's evidentiary burden and would enter an ERPO on that basis. What OAG contends it can do (see, e.g., OAG Letter, 2), and what this Court cannot endorse, is for NYSP/OAG to approach an unrepresented, adverse party, outside of court — sometimes while the respondent is still at the hospital for a mental health evaluation — and obtain from them a waiver of their statutory and civil rights.[FN18]

The trauma of participating in the hearing is not the only cause for concern regarding a child's well-being. The potential harms to K.L. from obtaining such an order against her extend well beyond the hearing date and are potentially life-long. Because the Red Flag Law is relatively new, [*12]the collateral consequences of having such an order entered are not yet entirely clear or fully developed.[FN19]
The Legislature has recently expanded the dissemination of ERPO records. (See Extreme Risk Protection Orders Must Now Be Published on Statewide Registry, Legislative Gazette, Feb. 18, 2025). Given this expansion, it is not unreasonable or farfetched to think the Legislature may conclude, for example, that school administrators should know if a student in their school has (or has had) an ERPO entered against them. 
The entry of an order of protection has "significant enduring consequences" and "places a severe stigma on a person." (Veronica P. v Radcliff A., 24 NY3d 668, 672 [2015]). As OAG carefully says, "[a]t the expiration of a final ERPO, the records of all proceedings related to the ERPO are automatically sealed to the general public." (Memo of Law, 21 [emphasis added][citing CPLR §6346[1]). However, it will still show up in a law enforcement search of K.L.'s history. It may impact her ability, for example, to work as a police officer or even as a school bus driver or in a daycare center one day. If, eight or ten years from now, she finds herself in contact with police for engaging in some form of youthful foolishness or misunderstanding, will she be treated differently from other youths because she has previously been found to be an "extreme risk"? "Since the order of protection remains in a police computer database . . . respondent may face additional law enforcement scrutiny and increased likelihood of arrest in certain encounters with the police." (Veronica P, 24 NY3d at 672). Separate from the availability of her official records, how often will she be asked, over the years to come, to truthfully disclose whether such an order was ever entered against her? (See id. at 672-73; see also Orangetown P.D. v Cashell, 238 AD3d 1152, 1153-54 [2nd Dept. 2025][finding that concerns set forth by Court of Appeals in Veronica P. applied equally to ERPOs]).
The Court has no crystal ball to know exactly what impact going through life with a history of an ERPO would have. But a sealing provision (that already has five express exemptions) does not make the black mark against her any less permanent. Every adult involved in such decision making has an obligation to at least think about the potential consequences and not dismiss them as nothing more than attendance "for one hearing date." If nothing else, K.L. would always know that the police and a court branded her as a danger to herself or others. So far as the Court can perceive, no one at OAG considered the impact on this child, who could not legally handle a gun, and whose family had none in their home. Rather, despite all of the concerns discussed above, and despite the absence of any firearms at all, obtaining an ERPO against K.L. would have been logged as a positive statistic in the State's battle against gun violence.
While the Court cannot find that OAG's disregard for these consequences rises to the level of intentional harassment or a malicious intent to injure K.L., and therefore does not make an independent finding of frivolousness on this ground, OAG's indifference to K.L.'s well-being further substantiates, under the totality of the circumstances, that OAG's handling of this case was legally frivolous.
Conclusion
Based on the foregoing, the Court finds that in the prosecution of an ERPO against the child-respondent K.L., the Office of the Attorney General engaged in frivolous conduct in litigation in [*13]violation of Part 130-1.1 of the Rules of the Chief Administrator of the Courts.[FN20]

Sanctions
A trial court is afforded broad discretion to impose sanctions for frivolous conduct. (Chevy Chase FSB v Lane, 277 AD2d 545, 545 [3rd Dept. 2020]). Upon a full consideration of the findings set forth above and the submissions of OAG, the Court declines to impose a financial sanction in this matter.
While the Court considers the foregoing review of the relevant law, and the Court's application of that law to this case, to be correct, the Court recognizes that it is not the only trial court to adjudicate ERPOs in the State of New York. In the context of this motion, despite the evidentiary shortcomings pointed out in the Court's decisions, OAG maintains that no further investigatory steps or pieces of evidence were required because, in OAG's opinion, 95% of New York courts would have granted the petition on this record. (Tr., 59). While the Court is skeptical of that percentage, it does not dispute that other courts have entered ERPOs against minors, including, occasionally, children at or under the age of 12. (See OAG Letter, 2 and Ex. 1; Memo of Law, 16 n.14). 
While the Court is not aware of any cases involving minors in which the legal issues discussed in this Decision have been litigated — as opposed to such orders being entered on consent or default —the Court acknowledges that this is the context in which OAG has made its litigation decisions. (But cf. NYSP v R.J.B, 87 Misc 3d 404, 415 [Sup.Ct. Ulster Cty. 2025] [appointing guardian for 10-year-old autistic ERPO respondent in case pursued by OAG]). For that reason, the Court concludes that it would be an improvident exercise of discretion to impose a sanction on OAG for its conduct in this case.
This shall constitute the Decision of the Court. The original Decision and all other papers are being delivered to the Ulster County Clerk for filing. The signing of this Decision shall not constitute entry or filing under CPLR §2220. Counsel is not relieved from the applicable provisions of that rule regarding notice of entry.
SO ORDERED.
Dated: December 12, 2025
Kingston, New York
ENTER,
JULIAN D. SCHREIBMAN, JSC

Footnotes

Footnote 1:Justice Evans, et al., Community Safety Innovations: New York State Initiatives to Strengthen Public Safety (John Jay College of Criminal Justice, Research and Evaluation Center, June 12, 2025).

Footnote 2:Gun Safety in New York State, available at https:// Gunsafety.ny.gov (last accessed November 21, 2025).

Footnote 3:CDC National Center for Health Statistics, Firearm Mortality | Stats of the States | CDC, available at https://www.cdc.gov/nchs/state-stats/deaths/firearms.html (last accessed November 9, 2025).

Footnote 4:See Gun Violence in America: An Analysis of 2018 CDC Data, available at https://search.issuelab.org/resource/gun-violence-in-america-an-analysis-of-2018-cdc-data.html (last accessed November 9, 2025).

Footnote 5:Because the Executive Order was directed to the NYSP — the statewide law enforcement agency over which the Governor has direct authority — the increase in ERPO applications has not been uniform statewide but rather has been focused on rural communities where NYSP provides a greater degree of law enforcement support. Although the law was also subsequently amended to encompass all police agencies, this Court has not observed any significant increase in applications, at least in this County, from agencies other than NYSP.

Footnote 6:New York Office of Court Administration, ERPO Dashboard https://ww2.nycourts.gov/erpo-36201[last visited November 9, 2025]).

Footnote 7:The facts and circumstances of K.L.'s case are also detailed in the Court's decision denying the ERPO; however, the Court concludes that reviewing the facts in detail again here, rather than merely cross-referencing those findings, is helpful to understanding the Court's instant sanctions decision.

Footnote 8:In context, it appears that this is a continuation of a conversation, perhaps between the children earlier in the day. To the extent there is a background to this exchange or there are any other relevant texts between K.L. and her friend, before or after these, there is no evidence that they were obtained by NYSP or OAG and nothing has been provided to the Court.

Footnote 9:When it initiated the TERPO application, NYSP used K.L.'s full name in the caption and failed to redact it in the supporting papers as required by 22 NYCRR §202.5(e)(1)(iii). In its submissions on this motion, OAG has similarly failed to redact K.L.'s full name in the various places it appears in the NYSP paperwork. K.L's friend's full first name is also left un-redacted which, in conjunction with references to his mother's full name, effectively identifies him as well. The Court has replaced his name here with "B." The failure to comply with rules for the anonymization of children in court proceedings has been a recurring problem in ERPO petitions brought by NYSP/OAG.

Footnote 10:At the hearing on the final ERPO, the responding trooper clarified that rather than interview K.L. directly, they permitted her parents to confront her with the text messages and ask her about them, while in the troopers' presence. NYSP handled the matter in this fashion despite the texts containing the statement by K.L. that her parents hated her and that their alleged mistreatment of her was a basis for her purported suicidal ideation. At no time prior to her being placed in custody was K.L. spoken to in a safe space away from her parents.

Footnote 11:Lest there be any ambiguity, this "K.L." is not the same person as the child respondent in the instant case.

Footnote 12:At the ERPO hearing one of the responding troopers testified that he understood this statement to be a denial of the suicidal ideation expressed in her text messages. (Cheung Aff., Ex.6, Transcript of ERPO Hearing, 11).

Footnote 13:OAG was not involved in the decision to seek a TERPO and, therefore, the TERPO application is not within the scope of the present motion. However, in its memorandum of law, OAG defends the application for a TERPO with reference to an ambiguous provision of the Red Flag Law that the Court takes this opportunity to highlight. OAG argues that seeking the TERPO was appropriate, despite respondent's age, because the issuance of a TERPO "would permit the removal of any firearms possessed by other family members that might be accessible to Respondent." (Memo of Law, 2 [emphasis added]). In asserting this, OAG appears to be relying on CPLR §6342[8], which provides:

 A law enforcement officer serving a temporary extreme risk protection order shall request that the respondent immediately surrender to the officer all firearms, rifles and shotguns in the respondent's possession and the officer shall conduct any search permitted by law for such firearms. The law enforcement officer shall take possession of all firearms, rifles and shotguns that are surrendered, that are in plain sight, or that are discovered pursuant to a lawful search. As part of the order, the court may also direct a police officer to search for firearms, rifles and shotguns in the respondent's possession in a manner consistent with the procedures of article six hundred ninety of the criminal procedure law. (emphasis added)

OAG appears to read this provision as authorizing the removal of all firearms, regardless of by whom they are owned or possessed, from the residence or location where a respondent may be found at the time the TERPO is served. Anyone other than a respondent may then petition for the return of their guns under CPLR §6344. It is possible that OAG is correct. However, while the statute plainly authorizes law enforcement to err on the side of seizure, the repeated references to firearms "in the respondent's possession," suggests that law enforcement may not knowingly seize firearms belonging to someone other than the respondent. This would foreclose seizing any firearms in a home where the respondent is under 16. In any event, this justification for the TERPO is not valid here because K.L.'s parents consented to a search of their home and thus, by the time they applied for the TERPO, NYSP already knew there were no guns in her home.

Footnote 14:While it is true that Red Flag hearings must be conducted promptly and that only the respondent has the ability to request an adjournment, it is entirely within the petitioner's control when to initiate ERPO proceedings. NYSP made a decision to file a TERPO immediately after taking K.L. into custody. It was not required to do so. OAG then made the decision to proceed with the ERPO after the TERPO was denied, rather than withdraw it without prejudice. OAG had the power, at any time, to release the time-pressure of the hearing schedule.

Footnote 15:OAG is not the only legal office to represent ERPO petitioners in this Court, but it is the only one that regularly eschews civilian witness testimony.

Footnote 16:No body camera footage was offered in evidence.

Footnote 17:"When we can talk about our feelings, they become less overwhelming, less upsetting, and less scary. The people we trust with that important talk can help us know that we're not alone." Fred Rogers, available at https://www.misterrogers.org. Last visited Dec. 9, 2025.

Footnote 18:Aside from the substantive concern, the Court is hard-pressed to understand how a state trooper could ever obtain a signature on this form from a respondent without the explanation of it constituting legal advice (by a non-lawyer to an adverse party).

Footnote 19:As an example of the ripple effect of such proceedings, one ERPO respondent informed the Court that her Global Entry pass had been cancelled by the U.S. State Department upon the entry of the TERPO against her.

Footnote 20:The Court emphasizes that it makes no finding regarding, and has not considered sanctioning, the NYSP in this matter. While the Court has concerns about some of the steps taken by NYSP, it is not for this Court, in this context, to second-guess the on-the-spot judgments of the law enforcement officers handling the matter. Rather, it was the responsibility of the OAG's ERPO unit, as officers of the court, to examine the facts and circumstances of the case, review the evidence, and desist from pursuing a legally insufficient and frivolous case against a child.