NEW YORK CITY HEALTH AND HOSPITALS CORP., Appellant, v BRIAN H., a Patient Admitted to Jacobi Medical Center, Respondent. [857 NYS2d 530]—

Order, Supreme Court, Bronx County (Lucy Billings, J.), entered August 29, 2007, which, after a hearing pursuant to Mental Hygiene Law § 9.31, directed respondent's release from Jacobi Medical Center (JMC), unanimously reversed, on the facts, without costs, and the petition for an order retaining respondent for involuntary care and treatment in said hospital granted.

Respondent was admitted to JMC on July 9, 2007, five days after an M-80 firecracker exploded in his hands, causing severe injuries. Doctors were forced to amputate his left hand and three fingers on his right hand on July 11, because of potentially fatal infection. The need to amputate was partially due to respondent's delay in seeking medical attention. Two days after the surgery, respondent left the hospital, against medical advice. He was later returned by the police.

On July 17, 2007, respondent was admitted to the psychiatric unit of JMC on an emergency basis pursuant to Mental Hygiene

Law § 9.39. Two medical certifications supported the admission. The first, by a physician, described respondent and his immediate medical history as follows: "Mr. H[ ] is a 48 year old single male with long psychiatric history and history of multiple admissions. He was brought to ER by police when found wandering the street with hand injury sustained from firecracker. Patient is delusional and incoherent. He was treated and stabilized surgically before being transferred to Psychiatry for being dangerous to self due to psychosis."

The second certification, by a member of the psychiatric staff, noted that respondent had a "history of bipolar disorder and multiple admissions," and that he appeared "[d]isheveled, unkempt, disorganized in thoughts process and behavior." It described his speech as "pressured, circumstantial with flight of ideas," and his affect as "angry, inappropriate." The certification further described respondent as "guarded, irritably manic," and diagnosed him as having bipolar disorder, as manic, and as an alcohol dependent in remission.

On July 23, 2007, the hospital applied to have respondent involuntarily admitted pursuant to Mental Hygiene Law § 9.27. The application was signed by Dr. Faynblut, respondent's treating psychiatrist, who stated: "48 year old single white male brought from surgery s/p left hand amputation and three right fingers as he refused treatment there and tried to elope. Patient had firecrackers explosion on July 4th and did not seek any help. He remains irritable, labile, easily agitated to labile affect, pressured speech, disorganized, intrusive. Insight/Judgment—poor. Patient needs acute care."

The application was supported by two physicians who had examined respondent. One of the physicians described respondent as having had "multiple prior psychiatric hospitalizations," and being "easily agitated and hostile." He further asserted that respondent's insight and judgment were "significantly impaired," that respondent is "acutely manic" and "cannot function safely in the community and needs longer inpatient treatment." The second physician offered the same diagnosis and further certified that respondent "remains markedly pressured, circumstantial, intrusive, and still with complete impairment of insight and judgment." He further stated that respondent was a risk to himself.

On July 29, 2007, respondent gave written notice to JMC that he wanted to be released from the hospital within 72 hours. In his notice he acknowledged his bipolar disorder but asserted that he had reached maximum medical improvement. The next day, the director of psychiatry at JMC applied for court authori-

zation to retain respondent. He claimed that respondent had "a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he . . . is unable to understand the need for such care and treatment," and as a result of this mental illness, "poses a substantial threat of harm to self or others."

On August 15, 2007 a hearing was held on the issue of whether JMC could retain respondent. JMC presented the testimony of Dr. Faynblut, and respondent testified on his own behalf. There were no other witnesses. At the outset of the hearing, the parties stipulated that Dr. Faynblut qualified as an expert. They further stipulated to the admission of respondent's hospital records. The court explained that the latter stipulation meant that "the hospital record is admitted as a business record, but if there are other objections to specific contents, they'll be raised." At no point during the hearing did either party object to any specific entries in the hospital records.

Dr. Faynblut testified that respondent had been admitted for extensive hospitalization four times since November 2006, and that prior thereto he was hospitalized approximately once every three years. She testified that over time, respondent's level of function had decreased. She confirmed her diagnosis of bipolar disorder, which she explained was based on his history of manic and depressive episodes. Dr. Faynblut described her concern for respondent's well-being should he be released. She explained that he resides alone in a house without help, and that based on his history of self-neglect, he would not comply with any follow-up medical plan necessitated by the amputation surgery.

Dr. Faynblut further testified that the structured setting of the hospital benefited respondent insofar as it provided necessary encouragement for him to attend to his own hygiene and take the various medications prescribed to treat his bipolar disorder. She expressed concern that he would decompensate without the hospital's support.

JMC's counsel attempted to elicit testimony from Dr. Faynblut regarding what she had been told by respondent's family and outpatient treatment providers regarding his prospects for complying with a discharge plan. After Dr. Faynblut stated she was told that respondent has difficulty managing his finances, however, respondent's counsel objected and the court sustained the objection on hearsay grounds. The court made no evidentiary rulings concerning the medical records.

In respondent's testimony, he acknowledged that he had been hospitalized several times over the past year, although he claimed to have volunteered for, and complied with, outpatient

treatment. He stated that he sought medical assistance from a doctor two days after the July 4 accident, and that the doctor "helped" him and suggested that the following week he have another doctor reexamine the injury. However, he at first refused to disclose the name of the doctor who "helped" him, and asserted he did not remember the doctor's name. He claimed that shortly thereafter, he went to a regularly scheduled appointment with his psychiatrist, and that the psychiatrist suggested he go to the emergency room. He testified that he went to his sister's house that evening, and she called an ambulance for him. He claimed that he left the hospital after two days because a doctor told him he could. He further testified that the medication he was given at the hospital to address his mental disorder was not appropriate and caused him to decompensate. However, he testified that he was feeling good on his current medication and believed he could take care of himself outside of the hospital. He acknowledged that he lives alone and stated he is a retired custodial engineer, receiving $25,000 per year from the New York City Board of Education. Also, he denied that his family helps him pay his bills.

At the close of testimony, the IAS court denied the petition and directed respondent's release. The court stated:

"It is true that the Doctor concluded that [respondent] would be unable to manage himself if not involuntarily hospitalized, and he would be at high risk and decompensate.

"But, there is absolutely no evidentiary basis for those conclusions. She did testify that he required supervision or assistance for his hygiene, but was absolutely unspecific. Did she mean wound care, because of the use of only one hand? And no testimony as to the unavailability for family visits or visiting nurse to assist him with wound care and medication."

In its ruling, the court made no reference to the extensive hospital records in evidence pursuant to the parties' stipulation. The court did stay respondent's release for one week pending formulation of a discharge plan, over JMC's counsel's objection that any discharge plan would be futile if respondent was unwilling to cooperate in its execution.

We now reverse and grant JMC's petition. For a hospital to detain a patient for involuntary psychiatric care, it must demonstrate, by clear and convincing evidence, that the patient is mentally ill and in need of continued, supervised care and treatment, and that the patient poses a substantial threat of physical harm to himself and/or others (*Matter of Ford v Daniel R.*, 215 AD2d 294, 295 [1995]). Here, respondent does not dispute that he suffers from mental illness. Moreover, the very circumstances

requiring respondent's initial admission to JMC on July 9, 2007 are evidence enough that his mental illness substantially threatens his well-being (see *Matter of Consilvio v Diana W.*, 269 AD2d 310 [2000] [granting order of retention in part based on evidence that patient failed to seek treatment for a broken ankle]). Respondent failed to seek immediate medical treatment for a severe injury that no person of sound mental health would have ignored. While his testimony suggests that he went to JMC voluntarily after his psychiatrist recommended that he seek treatment for his injury, the admission chart reflects that he refused this advice, that his sister called 911 after he showed up at her house, and that he refused medical care and was deemed lacking capacity by the emergency room doctor. Moreover, he left the hospital against medical advice two days after a traumatic and life-changing surgery.

In any event, Dr. Faynblut's testimony, coupled with respondent's medical chart, the entirety of which was admitted into evidence without objection, contained more than enough evidence to establish the need for respondent to be retained. For example, in the two-week period preceding the hearing, respondent's chart indicated that he was "restless, pacing. . . talking to himself, making bizarre gestures, very labile switching from overly pleasant to extremely hostile." He was described during that same period as not having insight into his illness, as being irritable and easily agitated, and manic and disorganized. While repeated nursing notes stated that respondent was "maintaining good control," complying with his medications and permitting treatment of his wounds, those same notes indicated that he was under close observation. Moreover, respondent's compliance was consistent with Dr. Faynblut's testimony that the hospital environment benefited respondent.

Respondent's medical records contain documentation of hospitalizations prior to the one at issue, which strongly support JMC's position that respondent's immediate well-being is dependent on his being retained in the hospital. For example, in November 2006, respondent was admitted to JMC after his sister became concerned about his behavior, which included creating a disturbance at a polling place such that the police were summoned, and calling her repeatedly in the middle of the night to inquire after her children. His sister reported at the time that he had ceased attending to his activities of daily living, and that his apartment was a "mess." She further reported that respondent had attempted to grill hot dogs in their plastic wrapping.

Although the records for that hospitalization indicate respon-

dent was released after showing improvement, he was admitted to North Central Bronx Hospital two months later for treatment of severe depression. At the time of that admission, there was garbage in his refrigerator, three weeks of unopened mail, and the odor of gas in his apartment. After again being released in a much-improved condition, he was returned to the hospital less than four weeks later, in a manic and psychotic state, having not slept for two days. Again, he was released in much better condition, only to be hospitalized, one month later, in connection with the firecracker accident. Finally, the records state that as few as eight days before the hearing, respondent was minimizing his psychiatric symptoms and "not address[ing] what happened to his hands prior to admission."

This recent history clearly and convincingly demonstrates that notwithstanding respondent's position that he has achieved maximum improvement in the hospital, he is unlikely to be rehabilitated from the amputations and be able to adapt to life with only two fingers, without the direct medical supervision the hospital setting would ensure (*see Ford*, 215 AD2d at 295-296). Respondent's argument to this Court that he has the financial support of his family is belied by his own testimony that his parents only pay his bills when he is in the hospital. We note, too, that the parents live in Florida part of the year, and that his sister has demonstrated difficulty being with him when he is symptomatic. More importantly, hospital records reveal that respondent's family objected to his release to his home "as they feel he is unsafe [there] alone." Significantly, respondent offered no testimony from expert or—at the very least—disinterested witnesses to establish that he is able to attend to himself at home.

Because we find Dr. Faynblut's admitted testimony, as well as respondent's medical records, provided overwhelming support for JMC's determination that respondent should be retained, we find it unnecessary to reach the issue of whether Dr. Faynblut's testimony concerning respondent's ability to manage his finances was properly excluded. Concur—Mazzarelli, J.P., Saxe, Gonzalez and Acosta, JJ.