Abdus-Salaam, J.
(dissenting). The majority holds that a mentally ill patient who was involuntarily committed under article 9 of the Mental Hygiene Law based on a court’s determination that he was a danger to himself and to others should be released without a hearing to determine the status of his mental disability when a retention order has expired, despite the hospital’s proffer of evidence that the patient remains a peril. Indeed, the majority believes that even a *135 mentally ill dangerous person must be automatically released, solely because the hospital, due to administrative oversight, failed to timely file an application seeking the patient’s further retention pursuant to Mental Hygiene Law § 9.33.
The majority reaches this ominous and untenable conclusion in spite of the plain language of Mental Hygiene Law § 33.15 (b) which expressly directs that where a person retained by a facility brings a writ of habeas corpus to question the cause and legality of his or her detention, “[a] court shall examine the facts concerning the person’s alleged mental disability and detention” (emphasis added). The majority declares that Mental Hygiene Law § 33.15 neither applies upon the filing of a writ of habeas corpus nor requires the court to examine the facts concerning a person’s mental condition prior to release. This proclamation is incongruous on its own terms, and the reasoning behind it is perplexing. By the majority’s rationale, adherence to the statute is not required in cases such as this one because the statute does not in so many words expressly supplant the common-law writ of habeas corpus in the context of detentions under Mental Hygiene Law article 9. But surely that cannot be true, if “shall” means “is required to” (Black’s Law Dictionary [10th ed 2014], shall). To the contrary, the statute on its face absolutely requires a factual determination of the patient’s mental state and fitness for release “[u]pon the return of such a writ of habeas corpus” (Mental Hygiene Law § 33.15 [b]), and that unqualified statutory command is incompatible with the majority’s decision to grant automatic release to patients upon the filing of a common-law habeas writ. Because the majority declines to follow the unambiguous language of the statute or acknowledge its clear practical purpose, I must respectfully dissent.
The majority’s analysis is based on the premise that the habeas corpus provision of the Mental Hygiene Law “does not supplant the common-law writ of habeas corpus available through CPLR article 70” (majority op at 130) because the Mental Hygiene Law § 33.15 habeas provision applies only where patients are being held pursuant to a lawful order of retention and seek an early release. However, the statute, on its face, applies to a person retained who brings a writ of habeas corpus. It does not restrict this provision only to cases where a patient is lawfully retained and seeks an early release. Thus, the majority’s conclusion flies in the face of the clear, unambiguous language of Mental Hygiene Law § 33.15, and *136 runs afoul of the well-settled canon that “[t]he Legislature is presumed to mean what it says, and if there is no ambiguity in the act, it is generally construed according to its plain terms” (McKinney’s Cons Laws of NY, Book 1, Statutes § 94, Comment).
In my view, there is no rational reason to determine that Mental Hygiene Law § 33.15 does not apply in this instance, and thereby conclude that without any review by the court, and over objection by the hospital, a patient involuntarily retained must be released solely because a hospital has failed to comply with the statutory requirements of the Mental Hygiene Law. Courts have held to the contrary, and for good reason (see e.g. State of N.Y. ex rel. Karur v Carmichael, 41 AD3d 349 [1st Dept 2007] [although hospital failed to respond to patient’s request for a hearing challenging his commitment pursuant to Mental Hygiene Law § 9.31 and failed to timely apply for continued retention, granting of writ of habeas corpus and directing immediate release was error and matter remanded for a hearing pursuant to Mental Hygiene Law § 33.15]; see also State of N.Y. ex rel. Harkavy v Consilvio, 29 AD3d 221, 227-228 [1st Dept 2006] [Mental Hygiene Law § 33.15, “which is directed exclusively to those retained in psychiatric facilities,” is more specific than CPLR article 70 “and thus controlling in these mental hygiene cases” (citations omitted)], read on other grounds 7 NY3d 607 [2006]; People ex rel. Noel B. v Jones, 230 AD2d 809 [2d Dept 1996] [upon habeas petition brought by patient whose involuntary commitment order had expired, court required to conduct hearing to determine patient’s mental status despite the hospital’s failure to comply with two statutory deadlines]).* The patient in this case, Stephen S., who is schizophrenic, had been hospitalized on several prior occasions for psychosis before he was involuntarily admitted to Holliswood Hospital. During his six-month admission, he struck and threatened staff members and patients numerous times, stabbed a staff member in the neck with a pen, assaulted his mother and attacked and choked his *137 treating psychiatrist. Yet, because the hospital inadvertently missed the deadline for filing a retention application, the majority concludes that a court must grant his habeas petition without any consideration of his mental condition. This does not advance the treatment and care of the mentally ill patient or protect society from one who poses a danger to others.
Holding a hearing upon return of the writ of habeas corpus will not “effectively eliminate the availability of the writ” (majority op at 131) for patients who seek to obtain release from an unlawful detention. Such patients will still receive the procedural protections required by due process. As this Court noted in Savastano v Nurnberg (77 NY2d 300 [1990]):
“Although there can be no doubt that an involuntarily admitted mentally ill patient does not abandon his or her constitutional rights at the facility door, it is equally true that the procedural protections required by due process must be determined with reference to the rights and interests at stake” (77 NY2d at 307 [citations omitted]).
The rights and interests of a mentally ill person who is dangerous, and who requires continued involuntary commitment, will only be promoted by such a hearing. Thus, contrary to the majority’s conclusion, adherence to the mandate of Mental Hygiene Law § 33.15 does in fact provide a patient with an effective remedy. If the patient should no longer be retained, he/she will be immediately released upon return of the writ. Requiring a hearing regarding the patient’s mental status does not, as suggested by the majority, somehow facilitate or encourage a hospital’s flagrant disregard for the due process protections embodied in the Mental Hygiene Law (majority op at 133). Rather, it protects the patient and the public.
Furthermore, contrary to the majority’s supposition, holding a hearing where a hospital brings a retention application in response to a patient’s habeas petition would not shift the burden of proof to the patient. Where a hospital seeks to retain a person for involuntary psychiatric care, “it must demonstrate, by clear and convincing evidence, that the patient is mentally ill and in need of continued, supervised care and treatment, and that the patient poses a substantial threat of physical harm to himself and/or others” (New York City Health & Hosps. Corp. v Brian H., 51 AD3d 412, 415 [2008]). The cases cited by the majority for this “burden shifting” concern are inapposite as they involve situations different from the one here. Matter *138 of Mental Hygiene Legal Servs. ex rel. James U. v Rhodes (195 AD2d 160, 162 [3d Dept 1994]) involved a patient who pleaded not responsible by reason of mental disease or defect to charges of attempted murder and reckless endangerment, who was detained pursuant to a two-year retention order, and who sought early release. In Matter of Winslow v O’Neill (153 AD2d 563, 564 [2d Dept 1989]), a patient who was subject to a six-month retention order sought release prior to the expiration of the court order authorizing retention, but failed to submit any medical evidence to rebut the outstanding retention order that determined he was in need of inpatient care and treatment. Thus, in both of those cases, the patient was seeking to show that his mental condition had changed since the court had ordered him retained, whereas in this situation, there is no longer any court order in effect determining that the person required involuntary commitment.
In sum, the logical and plain interpretation of Mental Hygiene Law § 33.15 is that the legislature intended that a mentally ill person who poses a danger to himself and/or to others would not be released without court review even under circumstances where the person’s commitment order had expired. Accordingly, I would affirm.
Chief Judge Lippman and Judges Pigott, Rivera and Fahey concur; Judge Abdus-Salaam dissents and votes to affirm in an opinion.
Order reversed, without costs, the habeas corpus proceeding converted into a declaratory judgment action, and judgment granted in accordance with the opinion herein.

 This Court’s terse opinions cited by the majority (People ex rel. Jacobs v Director of Gowanda State Hosp., 14 NY2d 663, 665 [1964], affg 19 AD2d 858, 858 [4th Dept 1963]; People ex rel. Granskofski v Whitehead, 8 NY2d 962, 963 [1960], affg 10 AD2d 801, 801 [4th Dept 1960]) for the proposition that a patient may use a writ of habeas corpus to obtain release where a facility failed to follow appropriate procedures do not analyze the issue presented here.