Matter of Redacted (2025 NY Slip Op 25286)

[*1]

Matter of Redacted

2025 NY Slip Op 25286

Decided on December 31, 2025

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 31, 2025
Supreme Court, Kings County

In the Matter of the Retention of [Redacted], A Patient Admitted to NYP Brooklyn Methodist Hospital, Petitioner.

Index No. XXXXXX/XXXX

Mental Hygiene Legal Service, Brooklyn (Michele L. Fischetti of counsel), for patient.
Garfunkel Wild, P.C., Garden City (Nicholas M. Summo of counsel), for hospital.

Aaron D. Maslow, J.

Papers Read: NYSCEF-filed Document Nos. 1-5.
This decision memorializes and supplements the oral decision dictated on the record following the hearing held on December 29, 2025, in the above-captioned proceeding pursuant to Mental Hygiene Law § 9.31, which provides for a retention hearing on the initiative of a patient who is involuntarily admitted as a psychiatric patient. The Court granted the patient's application to be released forthwith from the psychiatric unit of New York Presbyterian Brooklyn Methodist Hospital.[FN1]
At the hearing, two people testified: the attending psychiatrist at the hospital and the patient. Respective counsel made closing statements after both sides rested.
The patient, in her mid-40s, was brought to the hospital by her mother. Pursuant to the "two physician" process of Mental Hygiene Law § 9.27, she was admitted on December 4, 2025.I. Treating Doctor's TestimonyThe treating doctor, who was the patient's attending psychiatrist and collaborated with a nurse practitioner in treating her, testified that the patient was with her mother when she came to the hospital. Per the ER assessment, the patient had wielded a weapon, a knife, with her mother, who had brought her back to New York, after locating her at a shelter in Las Vegas. The patient had a daughter there. The patient had previously, in 2007, been in a shelter.
At the hospital, the patient was diagnosed with bipolar disorder with psychotic features. She had been observed laughing and talking to herself. She cried easily and veered off topic. After reaction from another medication, the patient was switched to Haldol effective December 18, 2025. The hospital needed to stabilize her on that medication, a process that needed another week. The treating doctor was concerned about other people — that the patient might become violent. There were no less restrictive alternatives for her treatment. Right now, there was no safe place for her to go. She needed to be discharged safely with a plan. If she were discharged now, her prognosis was poor. The hospital was considering discharging her with a long-acting dose of her medication.
The treating doctor acknowledged that the patient had not engaged in any altercations, had not missed a dose of her medication, and had been eating and sleeping. She attended some of the group therapy sessions, but not all. Her ADLs were acceptable. She did not have any delusions. He related that the patient said her presence in the hospital was a misunderstanding.
The treating doctor conceded that the patient was not at a substantial risk of harm to herself. He did opine that she was a substantial risk of harm to others, and this was based solely on the fact that her mother said she wielded a knife on her. In testifying to this, the treating doctor stated that he relied on collateral sources in arriving at his diagnoses. These sources included the family, the social worker, the ER assessment. The mother had made a statement about the knife at the ER. His knowledge about the alleged knife wielding was based on what his staff related to him. He himself did not read the intake notes about the alleged knife incident.
II. The Patient's Testimony
The patient testified that in 2009 she was diagnosed with bipolar disorder, the symptoms being intrusive thoughts, oversleeping, and going on shopping sprees.
She agreed with the hospital's diagnosis of her as bipolar but she felt she was in for too [*2]long, which was why she filed for release. She felt better; she was calmer and ready to be discharged. She was on Social Security disability. If released, she would go to a walk-in shelter or to the home of a neighbor of her mother's; the neighbor would always welcome her. She would seek out a psychiatrist in the community.
As for the knife, the patient described Thanksgiving dinner and food to be cut up, but the exact details of this were unclear to the Court. She thought her mother was upset at the time because the mother's son had gotten someone pregnant.
The patient testified in a calm, orderly, respectful, and candid fashion. Her speech delivery was at a normal pace.
III. Discussion
A. Background Statutory & Case Law
The recent opinion in Matter of Raymond E. (242 AD3d 68, 71-72 [2d Dept 2025]) provides a summary of Mental Hygiene Law provisions governing involuntary admission of mentally ill persons:
Pursuant to Mental Hygiene Law § 9.27 (a), "[t]he director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians . . . accompanied by an application for the admission of such person." Thereafter,"[t]he director of the hospital where such person is brought shall cause such person to be examined forthwith by a physician who shall be a member of the psychiatric staff of such hospital other than the original examining physicians . . . whose certificate or certificates accompanied the application and, if such person is found to be in need of involuntary care and treatment, [he or she] may be admitted thereto as a patient as herein provided" (id. § 9.27 [e]).Within five days following the admission, "[t]he director shall cause written notice of a person's involuntary admission on an application supported by medical certification to be given forthwith to the [M]ental [H]ygiene [L]egal [S]ervice" (id. § 9.29 [a]; see id. § 9.29 [b]).Pursuant to Mental Hygiene Law § 9.31, at any time within 60 days from the date of the involuntary admission of a patient, the patient or any relative or friend or the Mental [*3]Hygiene Legal Service may give notice in writing to the director of a request for a hearing on the question of need for involuntary care and treatment, and upon receiving notice of such request, the director must send a copy of such notice with a record of the patient to the appropriate court and the Mental Hygiene Legal Service (see id. § 9.31 [a], [b]). Upon receipt of such notice, the court"shall fix the date of such hearing at a time not later than five days from the date such notice is received by the court and cause the patient, any other person requesting the hearing, the director, the [M]ental [H]ygiene [L]egal [S]ervice, and such other persons as the court may determine to be advised of such date. Upon such date, or upon such other date to which the proceeding may be adjourned, the court shall hear testimony and examine the person alleged to be mentally ill, if it be deemed advisable in or out of court. If it be determined that the patient is in need of retention, the court shall deny the application for the patient's release" (id. § 9.31 [c]).In addition, Mental Hygiene Law § 9.33 provides that no later than 60 days from the date of an involuntary admission of a patient, or 30 days from the date of an order denying an application for a patient's release pursuant to Mental Hygiene Law § 9.31, whichever is later, if the director of a hospital determines that a patient is in need of continued retention, the director shall apply to the court for an order authorizing continued retention (see id. § 9.33 [a])."Pursuant to Mental Hygiene Law § 9.33, the Supreme Court may authorize the retention of a patient in a hospital for involuntary psychiatric care upon proof by clear and convincing evidence that the patient is mentally ill and in need of further care and treatment, and that the patient poses a substantial threat of physical harm to himself [or herself] or others" (Matter of Daniel C. [South Beach Psychiatric Ctr.], 207 AD3d 539, 539-540 [2d Dept 2022]; see Matter of Marie H., 25 AD3d 704 [2d Dept 2006]).Upon the demand of the patient, the Mental Hygiene Legal Service, or anyone on the patient's behalf, the court shall, or may on its own motion, fix a date for the hearing of an application made pursuant to Mental Hygiene Law § 9.33, in like manner as is provided for hearings in Mental Hygiene Law § 9.31 (see id. § 9.33 [c]). The provisions of Mental Hygiene Law § 9.31 generally "shall apply to the procedure for obtaining and holding a hearing and to the granting or refusal to grant an order of retention by the court" (id. § 9.33 [c]). "[T]he court shall hear testimony and examine the person alleged to be mentally ill, if it be deemed advisable in or out of court" (id. § 9.31 [c]; see id. § 9.33 [c]).The Court also acknowledges the following holding in Matter of Cynthia G. (Kings County Hosp.), 188 AD3d 881, 882 [2d Dept 2020]): "In order to retain a patient in a hospital for involuntary psychiatric care, the hospital must establish, by clear and convincing evidence, that [*4]the patient is mentally ill and in need of further care and treatment, and that the patient poses a substantial threat of physical harm to herself or to others" (Matter of Jeannette S., 157 AD2d 783, 783 [1990]; see Matter of Gary F. [Bronx Psychiatric Ctr.], 143 AD3d 495, 495-496 [2016]; Matter of Anonymous v Kings County Hosp. Ctr., 115 AD2d 513, 514 [1985])."
Additionally, the following from Matter of Ladapo (Pierina F.), 85 Misc 3d 860, 862-863 [Sup Ct, Queens County 2024]) has been considered: "As a threshold matter, it is not clear that Pierina F. seeks release from her involuntary commitment. . . . But to the extent that she does, the Hospital must show by clear and convincing evidence that (1) she has a mental illness; (2) is in need of further care and treatment; (3) is unable to understand the need for such care and treatment; and (4) poses a substantial threat of harm to herself or others if released (see Matter of Tarrence A. [Mid-Hudson Forensic Psychiatric Ctr.], 132 AD3d 985 [2d Dept 2015]; Matter of Edward L., 137 AD2d 818, 819 [2d Dept 1988]).
As per the above, the Court conducted a hearing to determine whether the patient was in need of retention. It is noted that "If it be determined that the patient is not mentally ill or not in need of retention, the court shall order the release of the patient" (Mental Hygiene Law § 9.31 [c]). " '[N]eed for retention' means that a person who has been admitted to a hospital pursuant to this article is in need of involuntary care and treatment in a hospital for a further period" (id. § 9.01 [d]). " '[I]n need of involuntary care and treatment' means that a person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that the person is unable to understand the need for such care and treatment" (id. § 9.01 [b]).
The concept of substantial threat of physical harm, discussed in case law, is actually defined statutorily in the context of the definition of the terms "likelihood to result in serious harm" or "likely to result in serious harm": "1. a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to themself, or 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm, or 3. a substantial risk of physical harm to the person due to an inability or refusal, as a result of their mental illness, to provide for their own essential needs such as food, clothing, necessary medical care, personal safety, or shelter." (id. § 9.01 [c]).
B. The Four Factors
Accordingly, this Court assessed the issue of whether the patient should be released or retained on the following factors, each of which was required to be proved by the hospital with clear and convincing evidence:
(1) Is the patient mentally ill?
(2) Is care and treatment in the hospital for a further period essential to the patient's welfare?
(3) Is the patient's judgment so impaired that she is unable to understand the need for such care and treatment?
(4) Is there a substantial risk of physical harm, either
(a) to the patient, as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the patient is dangerous to themself, or(b) to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm, or(c) to the patient, due to an inability or refusal, as a result of their mental illness, to provide for their own essential needs such as food, clothing, necessary medical care, personal safety, or shelter?The Court analyzed the foregoing factors in terms of the evidence adduced. Discussed separately, the results are as follows.
(1) Mental Illness
Yes, the patient is mentally ill. She was diagnosed by the treating doctor as such and, in fact, the patient did not dispute that she has a bipolar disorder. The factor of mental illness was established through clear and convincing evidence.
(2) Care and Treatment in Hospital for Further Period Essential to Patient's Welfare
No, care and treatment in the hospital for a further period is not essential to the patient's welfare, and the hospital failed to prove this by clear and convincing evidence. The patient had not engaged in any altercations, had not missed a dose of her medication, and had been eating and sleeping. She attended some of the group therapy sessions, albeit not all. Her ADLs were acceptable. She did not have any delusions. The patient had a plan to return to the community which the court found rational. She agreed to seek assistance from a psychiatrist.
(3) Patient's Judgment so Impaired that Unable to Understand Need for Such Care and Treatment
No, the patient's judgment is not so impaired that she is unable to understand the need for [*5]such care and treatment. The patient maintained that she did not need care and treatment in the hospital but did recognize that she needed care and treatment for her mental illness, which she readily acknowledged, and she was willing to do so privately through a psychiatrist. She was calm and candid in her testimony and displayed no distress. Even though it was not her burden to do so, the patient proved by a preponderance of the credible evidence that she understood her need for care and treatment for her mental illness. As such, the hospital failed to prove by clear and convincing evidence that the patient's judgment is not so impaired that she is unable to understand the need for care and treatment.
(4) Substantial Risk of Physical Harm
The last, factor — substantial risk of physical harm — needs more discussion than the others, in light of the record facts specific to the patient's case. The Court was surprised that the hospital did not offer the patient's hospital records into evidence, even after inquiring of counsel whether this would be sought. Therefore, the hospital's efforts at establishing that the patient posed a substantial risk of physical harm relied on a diminished record — they were based solely on the testimony from the treating doctor. His concern that the patient might be violent was based solely on what the mother purportedly stated on admission. His knowledge of this ostensibly was based on the admission records, but in actuality the matter of the "knife wielding" was conveyed to him by his staff. It is obvious that this was hearsay.
In its oral decision, the court described the situation as entailing double hearsay: the mother's statement being recorded in the admission records, and the staff relating the statement to the treating doctor. Upon further reflection, the court deduces that the statement was triple hearsay: first, the mother told someone at intake ("the inscriber") in the hospital that the patient wielded a knife and the inscriber recorded this in the records; second, the inscriber, in effect, informed the doctor's staff that the patient wielded a knife when the staff read it in the intake records; and third, the treating doctor's staff told the treating doctor that the patient wielded a knife at the mother. The drawback of relying on this triple hearsay testimony is reflected in that by the time the treating doctor testified in court as a witness he did not know exactly what the mother said. For example, did the patient merely hold a knife? Did she brandish it? Did the patient use it in a menacing manner? What type of knife was it — small, medium, large, a sharp knife, a dull one? How close was the mother to the patient when this transpired? Was the mother "placed in reasonable fear of serious physical harm" (MHL § 9.01 [c] [2]? None of this is in the record. And this was crucial, because the court was being asked to retain the patient on the ground of substantial risk of harm to others based solely on this claim by the mother made at intake. No claim of harm to the patient herself was asserted by the hospital in its effort to retain her in its psychiatric unit.
The mother was not called by the hospital to testify and, again, it is noted that the hospital records were not offered into evidence. All the court was left with was triple hearsay testimony.
It is worth repeating the thorough analysis of hearsay in medical records in Mental Hygiene Law article 9 proceedings undertaken by the trial court in Matter of Dolan (Joan W.) (38 Misc 3d 781, 782-784 [Sup Ct, Nassau County 2012] [MHL § 9.60 proceeding to order continuation of assisted outpatient treatment]):
[S]hould the Court of Appeals holding in People v Ortega (15 NY3d 610 [2010])—admitting into evidence hearsay statements by crime victims contained in a hospital record that pertain to medical diagnosis and treatment of the victim—be expanded to hearings pursuant to article 9 of the Mental Hygiene Law where the hearsay statements are not made by the patient respondent but by, e.g., relatives or law enforcement personnel? This court answers the question in the affirmative, following the recent Appellate Division, Second Department, decision of Matter of Anthony H. (Karpati) (82 AD3d 1240 [2011]).In People v Ortega (supra), the Court of Appeals, in an opinion authored by Chief Judge Lippman, addressed for the first time in many years the admissibility of hearsay statements contained in medical/hospital records pursuant to the business records exception to the hearsay rule (CPLR 4518 [a]). "Hospital records fall within the business records exception when they 'reflect[ ] acts, occurrences or events that relate to diagnosis, prognosis or treatment or are otherwise helpful to an understanding of the medical or surgical aspects of . . . [the particular patient's] hospitalization' " (People v Ortega, 15 NY3d 610, 617 [2010], quoting Williams v Alexander, 309 NY 283, 287-288 [1955]). One example would be how the patient was injured (id.). In the two cases before it, the Court evaluated the statements made by two crime victims, one informing medical personnel inter alia that she was strangled by an "old boyfriend," and the other reporting to medical personnel that he "was forced to smoke [a] white substance from [a] pipe" (People v Ortega at 614, 616). The Court held that these statements, including a diagnosis by the attending physician that the victim suffered from "domestic violence [and] asphyxiation," were relevant to the diagnosis and treatment of the victims, including in one instance a safety plan for her, and thus admissible (People v Ortega at 614). In his concurring opinion, Judge Smith maintained that the Court implicitly recognized (and should adopt) "another hearsay exception, for statements made for purposes of medical diagnosis or treatment" (People v Ortega at 621). Judge Smith believed that hearsay statements which may be relevant to diagnosis and treatment can be interpreted by the trial court in a very broad manner and be admissible evidence, such as "when a patient has a mental health problem, it may often be true that almost any statement about his or her history will be within the hearsay exception" (id. at 622).Four months later, the Ortega holding was then applied by the Appellate Division, Second Department, in Matter of Anthony H., where a hearing had been conducted pursuant to Mental Hygiene Law § 9.60. This statute, commonly known as Kendra's Law, was enacted to provide "a system of assisted outpatient (AOT) pursuant to which psychiatric patients unlikely to survive safely in the community without supervision may [*6]avoid hospitalization by complying with court-ordered mental health treatment" (Matter of K.L., 1 NY3d 362, 366 [2004]). Eight different criteria must be proved by the petitioner by clear and convincing evidence before the court can order the outpatient treatment, such as that the patient "has a history of lack of compliance with treatment for mental illness that has . . . at least twice within the last thirty-six months been a significant factor in necessitating hospitalization" (Mental Hygiene Law § 9.60 [c] [4] [i]). In Matter of Anthony H., the Second Department held, without giving specific examples, that diagnoses in Anthony H.'s medical records, which stated that his hospitalizations were caused by his failure to take his medication, "were admissible under the business record exception to the hearsay rule, because the diagnoses were relevant to his treatment, and could be used to develop a discharge plan that would ensure his safety" (Matter of Anthony H. [Karpati], 82 AD3d 1240, 1241 [2011]). [Emphasis added by this Court.]Another decision discussing at length the issue of medical records containing statements by persons other than the patient was Matter of Raheem D. (54 Misc 3d 1225[A], 2017 NY Slip Op 50298[U], *1-3 [Sup Ct, Bronx County 2017] [not an MHL article 9 decision]):
New York State appellate courts have not ruled specifically on the issue raised in this case: is the medical records exception to the hearsay rule broad enough to cover statements made by a third party to a patient's treatment providers? Federal courts have answered this question in the affirmative when interpreting the Federal Rules of Evidence. For example, in Mendez v. United States, 732 F. Supp. 414 (S.D.NY 1990), the District Court held that under Federal Rule of Evidence §803(4), "[s]tatements need not refer to the declarant's physical condition." Id. at 423 (citing 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE para. 803(4)[01] *2 [1988]) (emphasis in original). The court admitted the statements of the patient's mother in that case, stating that "[i]n the case of a child, the parent or guardian's statements on behalf of the child is assumed reliable ." Id. at 424. Other courts have applied this same rationale, noting that a parent has an equally strong incentive to provide truthful information to a treatment provider in order to get proper treatment for their child. See, e.g., Danaipour v. McLarey, 386 F.3d 289, 298 (1st Cir. 2004) (mother's statements to doctor about children's abuse at the hands of their father admissible as pertinent to diagnosis and treatment); Lovejoy v. United States, 92 F.3d 628, 631-32 (8th Cir. 1996); United States v. Yazzie, 59 F.3d 807, 812 (9th Cir. 1995). In fact, a few federal courts have gone even further in admitting statements by third parties. The Fifth Circuit Court of Appeals upheld the admission of statements made in medical records by a patient's sister, Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 272 (5th Cir. 1990); and the First Circuit extended the exception to statements by an unknown witness. Bucci v. Essex Ins. Co., 393 F.3d 285, 298-99 (1st Cir. 2005). The Court of Appeals in Bucci provided a detailed analysis of the issue:There is no requirement, either in the text of the Rule, or the case law, that the speaker be the patient himself. [Danaipour, 386 F.3d 289]; see also 4 Stephen A. Saltzburg et al., [*7]Federal Rules of Evidence Manual § 803.02[5][d] (8th ed. 2002) ("Statements by bystanders, family members, and others, made for the purposes of treating an injured person and pertinent to that treatment, have often been admitted under Rule 803(4).). In general, under Rule 803(4), " the declarant's motive to promote treatment or diagnosis is the factor crucial to reliability." Danaipour, 386 F.3d at 298. Bucci, 393 F.3d at 298.In addition, at least some state courts have expanded the exception in this same way. See, e.g., Lawson v. Kreative Child Care Ctr., 2006 Mich. App. LEXIS 494 (Michigan 1st District Ct. of App. 2006); Warfield v. Commonwealth, 2004 Ky. App. Unpub. LEXIS 931 (Kentucky Ct. of App. 2004) (upholding trial court's decision to exclude particular statements, but stating that "the [Kentucky rule of evidence] is clearly broad enough to catch statements made by other persons on behalf of patients (so long as they were made for treatment or diagnosis), and has occasionally been so used") (citing Weinstein)).Turning to New York State, only a few trial-level courts have weighed in on this subject, including me in 2014. See Matter of A.M., 44 Misc 3d 514 (Bronx Co. Family Court 2014). In that case, I reviewed and agreed with the holdings in Matter of Dolan, 35 Misc 3d 781 (Nassau Co. Sup. Ct. 2012), and Feinstein v. Goebel, 144 Misc 2d 462 (Sup. Ct. Queens Co. 1989), admitting into evidence statements in medical records made by someone other than the patient. In Dolan, a civil proceeding about whether ongoing treatment was necessary for a patient, the trial court admitted statements reflected in medical records made by (1) the patient's son, (2) an outpatient program representative, and (3) the patient's caseworker outside of the hospital. In analyzing the issue, the court cited Justice Smith's concurrence in Ortega: "when a patient has a mental health problem, it may often be true that almost any statement about his or her history will be within the hearsay exception." Dolan, 35 Misc 3d at 783 (quoting Ortega, 15 NY3d at 622 [Smith, concurring op.]). It then held that these third party statements were "relevant to [the patient's] treatment, and could be used to develop a discharge plan that would ensure his safety." Id. at 784 (quoting Matter of Anthony H., 82 AD3d 1240, 1241 (2nd Dept. 2011)).In Feinstein, the court ruled in a civil action that statements made by a patient's son were admissible under the exception, holding that the son was under a duty to relate truthful information in order to insure the appropriate treatment for his parent. That court found that "[t]he trustworthiness of the son's statements to the house doctor are [sic] unquestionable," following the logic of Williams v. Alexander's holding that statements which are "helpful to an understanding of the medical or surgical aspects of [the hospitalization]" should be admitted. 144 Misc 2d at 465-66; see also 20-22 Prince LLC v. Tsue Kwai Yen, 32 Misc 3d 1224(A) (Sup. Ct. NY Co. 2011) (third party declarations admissible as germane to medical treatment).In A.M., a child neglect proceeding under Article 10 of the Family Court Act, I admitted [*8]statements made by the patient's wife and mother relating to their observations about the patient's mental health. 44 Misc 3d 514.These decisions evince an assumption that others, especially family members, are under a duty to relate truthful information in order to insure the appropriate treatment for the parent (see Matter of A.M. [Gene M.], 44 Misc 3d 514, 522 [Fam Ct, Bronx County 2014]).[FN2]

However, concerns about the admissibility of the substance of hearsay statements to a treating doctor from persons not the patient, as well as the doctor's opinion based on such statements, were raised in Matter of Daniel A. (7 Misc 3d 1025[A], 2005 NY Slip Op 50740[U] *3-4 [Sup Ct, Franklin County 2005] [MHL article 15 hearing]):
The difficulty presented in the instant case is even more acute than the circumstance obtaining in Borden. Not only did the hearsay material here form the "principal basis" for Dr. Niederbuhl's opinion, and not only was it secured to reinforce an opinion in an imminent trial rather than to enable treatment, it also lacks critical indicia of reliability in itself. The out-of-court source, Ms. Twilley, provided information (a medical diagnosis of spinal meningitis) which must be assumed to have been the product of further hearsay: no claim was ever made that Ms. Twilley has any medical expertise or qualifies as an expert herself. The reliability of out-of-court material which would be excluded were its source a medical expert is certainly not enhanced by the fact that the source of the hearsay is not. Furthermore, as brought forth on voir dire of Dr. Niederbuhl, Ms. Twilley was not herself a person wholly disinterested in the outcome of this proceeding: she was frightened or intimidated by both Mr. A and his "friends," and on the basis of her own welfare was arguably concerned that he not be released from care.The Hambsch Court made clear (and itself cited Justice Yesawich's concurrence in Borden for the proposition) that "[i]n order to qualify for the 'professional reliability' exception, there must be evidence establishing the reliability of the out-of-court material." 63 NY2d 723 at 726 (citations omitted). Such evidence of reliability is simply lacking here, and the offered opinion ought not to be received. See also Brown v County of Albany, 271 AD2d 819.It is clear, incidentally, that receipt of the substance of the out-of-court material is objectionable in itself, quite apart from the admissibility of the opinion tendered:"Moreover, plaintiff's expert not only was permitted to identify the report upon which he relied and to explain its significance in forming his opinion [gap in original] People v. Sugden, supra, pp 460-461; People v. Stone, supra, p 76; the report itself was admitted into evidence and read to the jury. The modification of the strict Keough rule under discussion was not intended to carve out such a new exception to the hearsay rule." Borden v Brady, 92 AD2d 983 at 984.It is thus the determination of this Court that the testimony of Dr. Niederbuhl, both as to his opinion on the age-of-onset issue, and as to the substance of his conversation with the aunt, may not be received.The questionability of the triple hearsay in this case is heightened because Mental Hygiene Law proceedings which can result in involuntary retention require the psychiatric facility to prove the need by the standard of clear and convincing evidence, as opposed to preponderance of the evidence.
Our high court has recently emphasized that clear and convincing evidence is "the most demanding burden in the civil legal system." (Matter of K.Y.Z., —N.E.3d&mdash, 2025 WL 2955728 at *6 [2025][[FN3]]). Clear and convincing evidence "is neither equivocal nor open to opposing presumptions." (In re Duane II, 151 AD3d 1129, 1131 [3rd Dept. 2017]). Indeed, the standard "forbids relief whenever the evidence is loose, equivocal or contradictory." (Matter of K.Y.Z. at *10 [quoting Matter of Westchester Med. Ctr. (O'Connor), 72 NY2d 517, 529 [1988]). In particular, while reliable hearsay may be used to support a finding under this standard, where such out of court statements "are equivocal or inconsistent, and not substantiated by other proof, they do not rise to the level of clear and convincing evidence." (People v Dominie, 42 AD3d 589, 591 [3rd Dept. 2007]; see also People v Stewart, 61 AD3d 1059, 1060 [3rd Dept. 2009][child's equivocal hearsay statement was not clear and convincing evidence]). As in the Red Flag Law, this standard generally applies when a person's rights are imperiled due to concerns about their mental well-being. As the United States Supreme Court articulated when explaining why it would impose a clear and convincing standard to cases of involuntary civil commitment:
At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is a risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. [*9]Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered.(Addington v Texas, 441 U.S. 418, 426-27 [1979]). (New York State Police v K.L., — Misc 3d &mdash, 2025 NY Slip Op 25267, *8 [Sup Ct, Ulster County 2025] [Red Flag Law hearing].)The Second Department accepts hearsay evidence in situations where one must meet the clear and convincing evidentiary burden, but it must be reliable (see People v Barrett, — AD3d &mdash, 2025 NY Slip Op 06740 [2d Dept 2025]; People v Banister, — AD3d &mdash, 2025 NY Slip Op 06628 [2d Dept 2025]; cf. People v Mingo, 12 NY3d 563 [2009], revg 49 AD3d 148 [2d Dept 2008]).
However, in Matter of S.K. (82 Misc 3d 1212[A], 2024 NY Slip Op 50290, *3 (Sup Ct, Broome County 2024]), the court stated:
Active suicidal ideation and recent suicidal gestures or attempts clearly constitute risks of serious physical harm to a person. The narrow issue for the Court is whether the collateral information appropriately utilized by S.K.'s treating physician to formulate his medical opinion and initiate treatment recommendations necessarily satisfies the legal standard applicable in an MHL §9.31 hearing requested by a patient. The Court finds that such evidence, excluded under the hearsay rules, cannot satisfy the clear and convincing standard required.Taking into account the foregoing discussion of case law concerning hearsay statements from persons other than the patient in medical records, the Court did not find reliable the statement by the patient's mother regarding the patient wielding a knife, which came in via the treating doctor's testimony, based as it was on what his staff told him, based on the staff's reading of the intake records, which records purported to reflect the mother's statement, especially considering that there was no amplification of details and taking into account that the burden of proof in this proceeding was clear and convincing evidence, the hospital medical records were not offered into evidence by the hospital, and the mother was not called as a witness. The contents of medical records in Mental Hygiene Law article 9 hearings are quite important and their absence supports release of a patient who was involuntarily admitted for treatment (see Matter of Tyrone M., 186 AD3d 604, 606 [2d Dept 2020] [failure to prove by clear and convincing evidence in treatment-over-objection hearing that treatment narrowly tailored to preserve patient's liberty interest]; Matter of Michael L., 26 AD3d 381, 381-382 [2d Dept 2006] [clear and convincing standard not met in treatment-over-objection hearing to order psychotropic drugs]; cf. New York City Health & Hosps. Corp. v Brian H, 51 AD3d 412 [1st Dept 2008] [medical records stipulated into evidence at MHL § 9.31 hearing before trial court whose order directing patient's release reversed]). Considering the triple hearsay in the hearing [*10]at bar, the lack of admission of the hospital records was fatal to the hospital's position that the patient posed a substantial risk of physical harm to others.
Therefore, the last factor in determining whether the patient should be released or retained — substantial risk of physical harm — is answered in the negative.
(5) Summation of Four Factors
While the patient was mentally ill with bipolar disorder, the hospital did not prove by clear and convincing evidence three factors: that care and treatment in the hospital for a further period was essential to her welfare, that her judgment was so impaired that she was unable to understand the need for such care and treatment, and that there was a substantial risk of physical harm to either herself or others.
IV. Conclusion
In arriving at the findings herein, the Court found both the treating doctor and the patient credible. The treating doctor is to be commended for his candor in acknowledging that he did not read the intake notes containing what the mother said, but relied on what his staff told him. The main flaw in the hospital's case was that it relied on triple hearsay, which was of questionable reliability in light of the medical records not being in evidence.
In closing, the Court notes that in this state, mentally ill people cannot be compelled to undergo treatment against their will in the absence of due process, which requires that the need for treatment be proved by clear and convincing evidence establishing that there are compelling factors (see Rivers v Katz, 67 NY2d 485 [1986]). Those factors were not established here.
For the foregoing reasons, the Court issued an order granting the patient's application for release. Release was directed forthwith.
Dated: December 31, 2025
Hon. Aaron D. Maslow
Justice of the Supreme Court

Footnotes

Footnote 1:To further privacy for the patient, she is not named within the body of the decision, and the copy of this decision submitted for publication will redact her name and the index number. The decision will refer to the patient as "the patient." The testifying doctor will be referred to as "the treating doctor." "The papers in any proceeding under [article 9] which are filed with the county clerk shall be sealed and shall be exhibited only to the parties to the proceeding or someone properly interested, upon order of the court" (Mental Hygiene Law § 9.31 [f]).

Footnote 2:For an extensive decision on the admissibility of patient statements in medical records in the context of summary judgment in personal injury actions, see Pillco v 160 Dikeman St., LLC, — AD3d &mdash, 2025 NY Slip Op 04495 [2d Dept 2025].

Footnote 3:This was a parental rights termination proceeding.